[S.F. No. 23892. Feb. 15, 1979.]

SONOMA COUNTY ORGANIZATION OF PUBLIC EMPLOYEES, Petitioner, v.
COUNTY OF SONOMA et al., Respondents;
THE STATE OF CALIFORNIA, Real Party in Interest.

[S.F. No. 23899. Feb. 15, 1979.]

CALIFORNIA ASSOCIATION OF PROFESSIONAL EMPLOYEES, AFL-CIO, Petitioner, v.
THE STATE OF CALIFORNIA et al., Respondents.

[S.F. No. 23902. Feb. 15, 1979.]

SANTA CLARA COUNTY DEPUTY SHERIFF'S ASSOCIATION et al., Petitioners, v.
COUNTY OF SANTA CLARA et al., Respondents.

[S.F. No. 23903. Feb. 15, 1979.]

MONTEREY COUNTY DEPUTY SHERIFF'S ASSOCIATION et al., Petitioners, v.
COUNTY OF MONTEREY et al., Respondents.

[L.A. No. 31002. Feb. 15, 1979.]

LONG BEACH FIREFIGHTERS ASSOCIATION, Petitioner, v.
CITY OF LONG BEACH et al., Respondents.

## Counsel

Peter M. Renkow, Doty & Renkow, Elliott J. Dixon, Alexander H. Singleton, Singleton & Brown, Craig M. Brown, Lewis & Marenstein and John G. Furay for Petitioners.

Schwartz, Steinsapir, Dohrmann & Krepack, Robert M. Dohrmann, Reich, Adell, Crost & Perry, Hirsch Adell, Geffner & Satzman, Leo Geffner, Lemaire, Faunce & Katznelsen, Edward L. Faunce, James R. Tweedy, Raymond L. Hansen, Bodle, Fogel, Julber, Reinhardt, Rothschild & Feldman, Stephen Reinhardt, Loren R. Rothschild, Lester G. Ostrov, James L. Marable, Charles P. Scully and Donald C. Carroll as Amici Curiae on behalf of Petitioners.

Stephen Warren Solomon, Ralph B. Saltsman, Troy C. Lee, Jr., and Emanuel Cowitt as Amici Curiae on behalf of Petitioners in Nos. S.F. 23902, S.F. 23903 and L.A. 31002.

Stanley K. Jacobs, Martin J. Thompson and Memel, Jacobs, Pierno & Gersh as Amici Curiae on behalf of Petitioner in No. L.A. 31002.

James P. Botz, County Counsel, John H. Larson, County Counsel, Steven L. Houston, Deputy County Counsel, Selby Brown, Jr., County Counsel, Steven Woodside, Deputy County Counsel, Iver E. Skjeie, County Counsel, Paul R. DeLay, Deputy County Counsel, Robert W. Parkin, City Attorney, John R. Calhoun, Assistant City Attorney, Blanche Deight,

Deputy City Attorney, Evelle J. Younger, Attorney General, Richard D. Martland, Jeffrey J Fuller and Susan P. Underwood, Deputy Attorneys General, for Respondent and for Real Party in Interest.

Burt Pines, City Attorney (Los Angeles), John B. Rice, Assistant City Attorney, Marie Corlett Blits, Clinton L. Burch and Shelly I. Rosenfield, Deputy City Attorneys, as Amici Curiae on behalf of Respondents.

Don Erik Franzen and Hertzberg, Kaplan & Koslow as Amici Curiae.

**OPINION**

**MOSK, J.**—On June 6, 1978, an initiative measure was passed by the electorate adding article XIIIA to the California Constitution. The provision, designated on the ballot as Proposition 13, placed significant limitations upon the taxing power of local and state government; the amount of revenue which local entities could raise by means of property taxes was sharply reduced.[1] In order to mitigate the effects of this reduction, the Legislature determined to distribute surplus funds which had been accumulated in the state treasury to local agencies.

By enactment of section 16280 of the Government Code,[2] the Legislature prohibited the distribution of state surplus or loan funds to any local public agency granting to its employees a cost-of-living wage or salary increase for the 1978-1979 fiscal year which exceeded the cost-of-living increase provided for state employees. In addition, the section declares null and void any agreement by a local agency to pay a cost-of-living increase in excess of that granted to state employees.

The primary issues raised in these five original proceedings for writs of mandate are whether section 16280 impairs the obligation of contracts in violation of article I, section 10, of the United States Constitution and article I, section 9, of the California Constitution, and whether the statute violates the home rule provisions of the California Constitution. (Art. XI, §§ 4, 5.)

---

[1] In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], we upheld the validity of the initiative measure against certain challenges to its constitutionality.

[2] All references are to the Government Code, unless otherwise stated.

In each proceeding, the petitioner is a labor organization representing employees of a local government agency upon whose behalf they bring these actions. The City of Long Beach, four counties, and some of their local legislative bodies and officers are named as respondents. The Counties of Los Angeles and Santa Clara and the City of Long Beach are chartered entities pursuant to article XI of the California Constitution. Monterey and Sonoma Counties are governed by general law. The state and various of its officers appear as real parties in interest.[3]

Each of the local entities entered into a memorandum of understanding (agreement) to pay to the employees represented by the petitioner labor organizations a wage increase for the 1978-1979 fiscal year. These agreements were ratified by resolution or ordinance adopted by the local governing bodies. Although the Legislature provided in the 1978-1979 budget for a 2½ percent salary increase for state employees, the Governor vetoed the increase. Thereafter, the local entities failed or refused to authorize the additional wages called for in the agreements which they had previously ratified.

Petitioners seek writs of mandate to compel the local agencies to grant the increases called for in the agreements and to prohibit the state from enforcing the condition for payment of state funds set forth in section 16280. We granted alternative writs of mandate in order to consider the important issues raised.

I

We consider, first, whether the provision of section 16280 invalidating agreements calling for wage increases by local public agencies violates the state and federal constitutional prohibitions against impairing the obligations of contracts. The section is set out in full in the margin.[4] Section 16281 provides that limiting wage increases for local employees will

---

[3]The term "respondents" as used in this opinion will refer to both real parties in interest and the local entities.

[4]Section 16280 provides: "No state funds from the state surplus or state loan funds shall be available to any local public agency which provides a cost of living wage or salary increase in the 1978-79 fiscal year for local public agency employees or cost of living increases for any other individuals, including AFDC and other welfare recipients, if such increase is in excess of the cost of living salary increase provided for state employees. The cost of living salary increase provided for state employees shall be determined by dividing the total amount made available by the Legislature for salary increases to state employees by the total salaries paid to state employees. If the Legislature limits the cost of living salary increase for state employees on the basis of salary range, the local public agency

"allow essential local government services to be maintained at a higher level than would otherwise be the case, and will promote full employment and prevent layoffs," and that the limitation of local employee salaries is designed "to alleviate the current fiscal crisis created by the passage of Proposition 13 . . . and to provide for maintaining essential services which would otherwise be lost."

We note as a preliminary matter that the agreements between the respondent local entities and petitioners are binding contracts.[5] Under the Meyers-Milias-Brown Act (§ 3500 et seq.) local governmental entities may enter into collective bargaining contracts with authorized employee organizations. Such organizations may meet and confer with the governmental body on all matters relating to employment conditions, including wages. (§§ 3500-3504; also see *Los Angeles County Civil Service Com.* v. *Superior Court* (1978) *ante,* p. 55 [151 Cal.Rptr. 547, 588 P.2d 249].) If agreement is reached, it shall be embodied in a "memorandum of understanding," which is then presented to the governing body for its determination. (§ 3505.1.) A majority of this court recently held that once adopted by the governing body, such agreements are "indubitably binding." (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 337-338 [124 Cal.Rptr. 513, 540 P.2d 609].)

There can be no doubt that section 16280 impairs the obligations entered into under these agreements. The Legislature could hardly have

shall likewise limit any cost of living increase for local public agency employees and other individuals on the same basis.

"Any provision of a contract, agreement, or memorandum of understanding between a local public agency and an employee organization or an individual employee which provides for a cost of living wage or salary increase to local public agency employees in excess of such increase provided for state employees is null and void to the extent of such excess.

"This section shall not preclude regular merit increases, established prior to June 6, 1978, longevity or educational increments, promotions, or transfers, but shall preclude the transfer of employees to new positions created with higher pay schedules for the purpose of circumventing this chapter.

"As used in this section, the terms 'salary' and 'wage or salary' shall not include any compensation other than wages or salaries, such as health benefits, retirement benefits, life insurance, vacation time, sick leave, perquisites of all kinds, and reimbursement of expenses.

"The amendment of this section made by the provisions of S.B. 2212 of the 1977-78 Regular Session of the Legislature does not constitute a change in, but is declaratory of, the existing law."

[5]Four of the five petitioners are covered by agreements which expire in 1979; the contract between the City of Long Beach and petitioner Long Beach Firefighters Association expires in 1980. Three petitioners have concluded contracts for two-year terms, while two have entered into three-year contracts.

expressed itself more clearly in this regard, for it declared *null and void* any provision of "a contract, agreement, or memorandum of understanding between a local public agency and an employee organization or an individual employee which provides for a cost of living wage or salary increase" in excess of the increase provided for state employees.[6]

■ But the fact that the state has impaired the obligations of these agreements by enactment of section 16280 is the beginning rather than the end of our analysis, for it has long been settled that although the constitutional provision, literally read, proscribes "any" impairment of contract it is "not an absolute one and is not to be read with literal exactness like a mathematical formula." (*Home Building & Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 428 [78 L.Ed. 413, 423, 54 S.Ct. 231, 88 A.L.R. 1481].) The state's police power remains paramount, for a legislative body "cannot 'bargain away the public health or the public morals.' " (*Id.,* at p. 436 [78 L.Ed. at p. 428].) Obviously, however, if the contract clause is to have any effect, it must limit the exercise of the police power to some degree. Our inquiry, then, concerns not whether the state may in some cases impair the obligation of contracts, but the circumstances under which such impairment is permissible.

In *Home Building & Loan Assn.* v. *Blaisdell, supra,* 290 U.S. 398, the United States Supreme Court comprehensively reviewed the history and application of the contract clause. It upheld the constitutionality of a Minnesota mortgage moratorium law designed to provide relief to landowners whose property was threatened with foreclosure. The legislation did not entirely abrogate a mortgagee's right to foreclose as provided in the contract, but, rather, for two years from the enactment of the law, the period of redemption from foreclosure sales was extended. During the extension period, the mortgagee was entitled to the rental value of the property.

The high court identified four factors which impelled it to hold that the Minnesota law did not amount to an unconstitutional impairment of the mortgage contract. First, Minnesota had declared an emergency as the

---

[6]Respondents explain that this provision was necessary in order to allow local entities to avail themselves of state assistance funds by August 31, 1978, when the first one-third of the funds was to be distributed. Without a provision invalidating agreements providing for wage increases in excess of the limitation set forth in the section, according to respondents, local entities would have been required to renegotiate labor agreements to eliminate the increases "and the demands made upon them could have been of such nature as to either force the local entities to hurriedly agree or to forego state assistance, cut essential services and effect layoffs."

justification for the law and in the Great Depression that declaration did not lack an adequate basis. Second, the legislation was enacted not for the advantage of particular individuals, but for the protection of a basic interest of society. Third, the law was appropriate to the emergency and the conditions it imposed were reasonable: the redemption period was extended upon reasonable conditions; the integrity of the mortgage indebtedness was not impaired; interest continued to run, and the right of the mortgagee to buy the property or to obtain a deficiency judgment remained inviolate. Finally, the legislation was temporary and limited to the exigency which provoked the legislative response.

In subsequent cases, these factors and others were applied by the high court to uphold (e.g., *El Paso* v. *Simmons* (1965) 379 U.S. 497 [13 L.Ed.2d 446, 85 S.Ct. 577]; *Veix* v. *Sixth Ward Assn.* (1940) 310 U.S. 32 [84 L.Ed. 1061, 60 S.Ct. 792])[7] or invalidate (e.g., *Treigle* v. *Acme Homestead Assn.* (1936) 297 U.S. 189 [80 L.Ed. 575, 56 S.Ct. 408, 101 A.L.R. 1284]; *W. B. Worthen Co.* v. *Kavanaugh* (1935) 295 U.S. 56 [79 L.Ed. 1298, 55 S.Ct. 555, 97 A.L.R. 905]; *W. B. Worthen Co.* v. *Thomas* (1934) 292 U.S. 426 [78 L.Ed. 1344, 54 S.Ct. 816, 93 A.L.R. 173])[8] legislation challenged as violating the contract clause.

[7]In *El Paso,* a Texas statute limiting to a five-year period previously unlimited rights to reinstate interests in lands purchased from the state was upheld on the grounds that a perpetual right to reinstatement was not a substantial inducement for the purchase, that the state's prior policy of allowing unlimited reinstatement privileges had unexpected and unforeseeable results, and that the purchaser was not seriously disadvantaged by the legislation in question whereas the state's interest in the subject matter of the legislation was an important one.

In *Veix* a New Jersey statute which altered the withdrawal rights of shareholders in a savings and loan association was upheld on the ground that, while the statute may not have constituted emergency legislation, building and loan associations were vital to the state's economy and when the appellant purchased his shares such institutions were "already regulated in the particular" to which he objected.

[8]*Treigle* also involved a statute modifying existing rights of withdrawal in building and loan associations. The statute was found to be invalid on the grounds that it did not purport to deal with an existing emergency, that it was neither temporary nor conditional, and that it deprived withdrawing members of the association of existing contract rights for the benefit of those who remained.

*Kavanaugh,* like *Blaisdell,* involved a statute diluting the rights of mortgage holders. The statute was found to be "an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." (295 U.S. at p. 62 [79 L.Ed. at p. 1302].) *Blaisdell* was distinguished on the ground that the statute involved there was less restrictive.

In *Thomas,* an Arkansas law which exempted the proceeds of a life insurance policy from collection by a judgment creditor was held invalid because the relief was not temporary and conditional and the statute contained no limitations as to time, amount, circumstances or need.

Similar factors have been applied in California decisions. In *Brown* v. *Ferdon* (1936) 5 Cal.2d 226 [54 P.2d 712] and *Hales* v. *Snowden* (1937) 19 Cal.App.2d 366 [65 P.2d 847], statutes providing relief to defaulting mortgagors were held to violate the constitutional prohibition against impairment of contracts because they were not limited to debtors who needed or desired relief.[9]

Two recent cases decided by the United States Supreme Court are particularly instructive. In *Allied Structural Steel Company* v. *Spannaus* (1978) 438 U.S. 234 [57 L.Ed.2d 727, 737, 98 S.Ct. 2716], a corporation challenged a Minnesota law which substantially increased the liabilities of certain corporations for the payment of pensions to employees. The high court held that the statute constituted an unlawful impairment of contract because it retroactively modified the compensation the company had agreed to pay its employees. The court opined that, although minimal alteration of contractual obligations would call for a lesser standard of inquiry, a severe impairment "will push the inquiry to a careful examination of the nature and purpose of the state legislation." The statute was invalidated on the grounds that it imposed upon corporations a substantial liability which was not a temporary alteration of contractual terms but worked severe and permanent change in those terms, the measure was not necessary to meet an important general societal problem, and it was not enacted to deal with a situation remotely approaching the broad and desperate economic emergency posed by the depression, as was the situation in *Blaisdell.*

Perhaps the decision which is most useful in resolving the problem at hand is *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1 [52 L.Ed.2d 92, 97 S.Ct. 1505]. In that case, as here, the government attempted to impair not obligations entered into between private parties, but the obligations of the public entity itself. New York and New Jersey had entered into a bistate compact to coordinate transportation facilities at the port of New York by establishment of the Port Authority. Under a 1962 statutory covenant, the two states agreed with the holders of bonds issued to finance activities of the Port Authority that, so long as the bonds remained outstanding, the revenues pledged as security would not be used for certain purposes. In 1974, the states·repealed the covenant in order to facilitate the financing of mass transit improvements.

[9]Other California cases cited by petitioners involving the application of the constitutional provision do not relate to statutes enacted to meet a public emergency. (E.g., *Miller* v. *State* (1977) 18 Cal.3d 808 [135 Cal.Rptr. 386, 557 P.2d 970]; *Stork* v. *State* (1976) 62 Cal.App.3d 465 [133 Cal.Rptr. 207].)

The repeal was held an unconstitutional impairment of contract because it eliminated an important security provision for the protection of the bondholders and was neither reasonable nor necessary to serve an important state interest. The court held that a less drastic modification of the bondholders' security rights would have sufficed, that alternative means of achieving the state's goals could have been adopted, and that changed circumstances did not justify the impairment because the need for mass transit in the New York metropolitan area had been known by the state as early as 1922.

The court recognized that the contract clause was not an absolute bar to subsequent modification of a state's own financial obligations, but held that in determining whether such a modification is justified, complete deference to a legislative assessment of reasonableness and necessity is not required because the government's self-interest is at stake. It stated, "[A] governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all . . . . [A] State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors . . . . [A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." (431 U.S. at pp. 26, 29, 30-31 [52 L.Ed.2d at pp. 112, 114, 115].)

 In applying these standards to the impairment of petitioners' contracts, we assess, first, the severity of the impact of section 16280 upon the contract rights of petitioners. Respondents urge[10] that the impairment is not substantial because it affects only a single contract provision for salary increases in the 1978-1979 fiscal year, and by its express terms does not invalidate contract provisions dealing with fringe benefits and other matters.[11] We reject this assertion. An increase in wages is frequently the

---

[10]It should be noted that, although for purposes of literary convenience, this opinion will attribute the arguments made by the two sides in these proceedings to "petitioners" and "respondents," all petitioners do not make each of the arguments ascribed to "petitioners," and not all respondents advance every argument attributed to "respondents." Indeed, aside from the County of Monterey, the local entities do not independently challenge the substance of petitioners' assertions, and some of them agree with petitioners' position.

[11]Although the impairment is severe, we agree with respondents that the invalidation of contract provisions calling for wage increases applies only during the 1978-1979 fiscal

very heart of an employment contract; other provisions, including those relating to fringe benefits, are inextricably interwoven with those relating to wages, since employees may surrender various employment benefits in exchange for a wage increase. And, unlike the situation in the cases cited above, in which contractual benefits were either postponed (*Blaisdell*) or enforcement remedies were altered (*El Paso*), in the present case the right of petitioners to a wage increase for the 1978-1979 fiscal year is irretrievably lost. Thus here, as in *Allied Structural Steel,* there was a "severe, permanent, and immediate change" in petitioners' rights under the contract (438 U.S. at p. 250 [57 L.Ed.2d at p. 740]) and it cannot be said that "[t]he measure taken . . . was a mild one . . . hardly burdensome" to petitioners (*El Paso* v. *Simmons, supra,* 379 U.S. at pp. 516-517 [13 L.Ed.2d at p. 459]).

Since the statute accomplishes a severe impairment of petitioners' contractual rights, the "height of the hurdle the state legislation must clear" is elevated and "a careful examination of . . . [its] nature and purpose" is required. (*Allied Structural Steel Company* v. *Spannaus, supra,* 438 U.S. at p. 245 [57 L.Ed.2d at p. 737].)

As we have seen, section 16281 declares that the salary limitation was intended by the Legislature to alleviate the "fiscal crisis" created by the passage of Proposition 13, and to provide for maintaining essential services, and that the measure would allow local government to continue services at a higher level than would otherwise be the case, would promote full employment, and prevent layoffs.

Respondents contend that this declaration of a fiscal emergency was justified. They rely in this connection upon a report prepared by the legislative analyst in May 1978, prior to the time the initiative measure was passed and section 16280 was enacted. The analysis, compiled for the Legislature, predicted the following: If Proposition 13 was enacted, local entities would lose $7 billion in property tax revenues, representing an average reduction of 57 percent of such revenues previously projected. As a result, local agencies would suffer an average 22 percent reduction in

year. The section does not expressly state that the limitation is confined to that year, but such a limitation is clearly implied if it is read as a whole. Its underlying purpose is to limit the payment of state funds for that year alone to local agencies granting wage increases, and nothing in the statute suggests that increases for subsequent years are affected. We also agree with respondents that the section, fairly construed, does not invalidate salary increases to employees of local entities which do not seek assistance from the state surplus or loan funds.

the overall revenue which had been anticipated for the 1978-1979 fiscal year. Such a reduction would not only require curtailment of essential services, but (assuming expenditure reductions were proportionately distributed between personnel costs and all other costs) an estimated 270,000 local employees would be laid off, increasing the state's projected 1978 unemployment rate from 7½ percent to 10 percent.[12]

In view of these and other dire consequences from the loss of revenue by local agencies as a result of the passage of Proposition 13, the Legislature was faced with a fiscal crisis of severe magnitude, assert respondents, and this emergency justified the limitation of wage increases to local government employees.

In assessing this contention, we must recall the admonition in *United States Trust Company* that complete deference to a legislative assessment of reasonableness and necessity is not required where, as here, government is attempting to modify governmental financial obligations. Here respondents rely upon the existence of a fiscal crisis as justification for the impairment,[13] but they have not met their burden of establishing that such a crisis existed. The estimate of an average 22 percent reduction in local government revenue in the legislative analyst's report assumes that the property tax revenues lost by local agencies as a result of Proposition 13 will not be replaced. But the Legislature almost immediately returned $5 billion accumulated in the state's surplus to local agencies to alleviate

---

[12]The report describes the effects of Proposition 13 upon the 6,296 cities, counties, school districts and special districts in California in the following terms: because a substantial proportion of the revenue received by local entities must be expended for programs mandated by federal or state law, substantial reductions would be required for discretionary programs or programs required by federal or state law as to which no level of service is specified. Thus, counties, cities, and fire protection districts would probably be compelled to reduce police and fire services. School districts would lose 30 percent of their total income, and community college districts might be required to eliminate summer sessions, dismiss teachers' aides, and close some campuses. Special districts would also be severely affected, particularly those which rely on property taxes for most of their revenue.

Respondents state that if each of the approximately 1 million public employees was granted a 5 percent increase in wages, assuming an average salary of $17,000 a year, the cost would amount to $850 million. But this estimate is highly conjectural. Nothing in the record suggests that all local government employees were to be granted wage increases for the 1978-1979 fiscal year, and the figures used as the basis for the estimate are merely surmises.

[13]We recognize that in *United States Trust Co.* v. *New Jersey, supra,* 431 U.S. 1, at pages 22-23, footnote 19 [52 L.Ed.2d at page 110], it was said that the existence of an emergency is not always required to justify a contractual impairment but is only one factor to be assessed in determining the reasonableness of the impairment. Here, however, respondents rely upon a fiscal emergency as the justification for the challenged legislation.

the potential—but not realized—effects of Proposition 13 (Gov. Code, § 16250 et seq.). Since five-sevenths of the revenues lost by the local entities was replaced by state funds, the loss to local entities amounts not to the 22 percent upon which respondents' claim of emergency is based, but, rather, to a loss of approximately 6 percent.[14] Respondents do not claim that a 6 percent loss of revenue would justify the invalidation of wage increases called for in the agreements between petitioners and the local entities.

There is no merit in respondents' assertion that, whatever relief measures were later taken, at the time the Legislature passed section 16280, there was an emergency caused by the passage of Proposition 13 which justified the salary limitation. The fiscal effects of Proposition 13 were not realized until July 1, 1978, after section 16280 was passed by the Legislature. More important, the $5 billion from the state's surplus was returned to local agencies in the very same measure which contains section 16280, and the Legislature added other provisions to the act to mitigate the effects of the loss in revenues to local agencies. (Stats. 1978, chs. 292, 332.)[15] Thus, the asserted "fiscal emergency" relied upon by respondents as justification for the salary limitation was largely alleviated by the very same bill which contains the limitation. **(3)** But even if these events had not occurred simultaneously, we would not be precluded from considering matters which followed the enactment of section 16280 for, as *Blaisdell* makes clear, "a law 'depending upon the existence of an emergency . . . to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed' " and "[i]t is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends." (290 U.S. at p. 442 [78 L.Ed. at p. 431].)

Respondents rely upon *Subway-Surface Sup'rs* v. *N.Y.C. Tran. Auth.* (1978) 44 N.Y.2d 101 [404 N.Y.S.2d 323, 375 N.E.2d 384], which held that a statute deferring a wage increase in a collective bargaining agreement with a public agency did not violate the United States Constitution. There

---

[14]Whether or not the actual loss of revenue to local entities amounted to 6 percent the record does not reveal, since respondents rely solely upon the legislative analyst's report which, as we point out above, was completed in May 1978, before Proposition 13 was passed, and before the extent of the actual loss was evident. Whatever the actual reduction, it is plain that it was substantially lower than the 22 percent predicted by the legislative analyst if the Legislature failed to grant any state surplus funds to local entities.

[15]For example, the measure created a state loan fund to assure payment of short term loans and bonds by local agencies during the 1978-1979 fiscal year. (§ 16492 et seq.)

are several important distinctions between *Subway-Surface* and the present case. It was conceded there by the petitioner employee organization that the fiscal emergency was so severe that the city could be forced to cease operating if the crisis was not relieved.[16] Here, by contrast, local government entities lost approximately 6 percent of their anticipated revenues. Moreover, in the New York case, the wage increase was deferred rather than completely eliminated, as in the present case.

*Subway-Surface,* like the present case, involved a multi-year contract, and the employees had performed services for the city for a substantial period prior to the wage freeze. Respondents rely upon the conclusion of the New York court that the impairment was reasonable because the contract was still executory at the time the freeze took effect. The court, after finding that the deferment was justified by the fiscal emergency, proceeded to consider whether the steps taken to meet the emergency were reasonable. In concluding that they were, it determined that since the employees had not rendered services for the second year of the two-year contract at the time of the freeze, the impairment as to them was prospective only. (404 N.Y.S.2d at p. 330.)

Here, of course, we do not reach the issue of whether the elimination of wage increases was a reasonable measure to resolve the problems engendered by Proposition 13 since, unlike the grave circumstances which existed in New York, the government has failed to meet its threshold burden of establishing that an emergency existed.

Even if respondents were not faced with this fundamental defect, we seriously question the New York court's rationale. A contract must be viewed as a whole; it cannot be fractured into isolated components. The

---

[16]Petitioner agreed with the following legislative declaration in the New York case: "The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.

"If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable government entity and create a clear and present danger to the health, safety and welfare of its inhabitants." (1975 N.Y.Laws, ch. 868, § 1.)

anticipated wage increases during the second year thereof may have affected the employees' wage demands for the first year of the contract, and undoubtedly many employees rendered their services in the first year in anticipation of their contractual right to the second year increase. It is doubtful, therefore, that the New York court was correct in its conclusion that the employees had not rendered consideration for the second year of the contract when the freeze was imposed.

It should be noted that slightly more than a month after *Subway-Surface* was decided, the same court which rendered that decision held that a statute requiring maternity care to be included in insurance policies could not be applied to policies previously issued which were renewable at the option of the insured. The impairment of contract was unjustified, it reasoned, because there was no economic emergency of broad scope, and only on "rare occasions and in extreme circumstances do rights fixed by the terms of a contract . . . give way to a greater public need." (*Health Ins. Ass'n. of America* v. *Harnett* (1978) 44 N.Y.2d 302 [405 N.Y.S.2d 634, 641, 376 N.E.2d 1280].)

Petitioners make an appealing argument that even if an emergency was created by Proposition 13, it would not justify the impairment of their contracts. The contention goes as follows: The passage of Proposition 13 by initiative was an action of the state. Thus, any emergency which existed subsequent to its enactment was created by the state itself, and a contract may not be impaired because of a crisis created by the state's voluntary conduct. They rely in this connection upon cases which hold that a state unconstitutionally impairs the obligation of its contracts if it limits its taxing power so as to disable itself from fulfilling its obligations. (See, e.g., *Hubert* v. *New Orleans* (1909) 215 U.S. 170 [54 L.Ed. 144, 30 S.Ct. 40]; *Wolff* v. *New Orleans* (1880) 103 U.S. 358 [26 L.Ed. 395].) We need not decide the merits of this argument, however appealing it may be, since it is clear, as we conclude above, that respondents have not demonstrated that Proposition 13 created an emergency warranting the invalidation of salary increases called for in petitioners' contracts.

It is not necessary to consider additional arguments made by the parties with regard to the issue of impairment because, in our view, respondents have clearly failed to satisfy their threshold burden of demonstrating that the substantial abridgement of petitioners' contract

rights to an increase in wages was warranted by a grave fiscal crisis, and they advance no other justification for the impairment.[17]

■ Thus we conclude that the provision of section 16280 which invalidates agreements granting cost-of-living wage increases to local public agency employees is invalid as an impairment of contract, in violation of both the state and federal Constitutions.[18]

## II

■ The next question for our determination is whether section 16280 violates article XI of the California Constitution because it interferes with the rights of chartered cities and counties to determine the compensation of their employees. Under section 5, subdivision (b), of article XI, chartered cities are granted "plenary authority . . . subject only to the restrictions" of that article to provide for the compensation of their officers and employees. Section 4, subdivisions (c) and (f), state that charter counties shall provide for the compensation of their officers and

[17]Petitioners suggest that the challenged statute is invalid under the standards set forth above because the Legislature could have selected alternative means to assure the continuance of essential services, such as by mandating that state funds be used first to provide such services. (See, e.g., § 16250, subd. (g).) They argue also that the declaration in section 16281 that the limitation "would allow essential local government services to be maintained at a higher level than would otherwise be the case" and would "promote full employment and prevent layoffs" is an insufficient basis to justify the contractual impairment. As we have seen, *United States Trust Company* holds that a state cannot refuse to meet its own financial obligations because it would prefer to spend the funds to promote the public good rather than the welfare of its creditors or for what it regards as an important public purpose. Moreover, petitioners claim that since the Legislature did not require that the revenue saved by the wage freeze be spent to prevent layoffs and provide essential services, the means chosen by the Legislature were not appropriate to the accomplishment of its objectives.

Respondents assert that section 16280 was enacted to promote the general public interest, that the limitation is necessary to alleviate the fiscal crisis, and that the emergency was not foreseeable. They also make the dubious argument that the standards set forth in *United States Trust Company* are not applicable here because the state has mandated the impairment, and it is not attempting to reduce its own financial obligations but the obligations of local agencies. Acceptance of this theory would require us to hold that the state may compel a local entity to impair an obligation which the local entity itself would be precluded from breaching under the contract clause.

[18]In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 240, in response to an argument that Proposition 13 unconstitutionally impaired the contracts of certain bondholders, we observed that the state had created the Local Agency Indebtedness Fund to alleviate the immediate effects of the proposition upon the holders of bonds of redevelopment agencies. Thus, there, as here, we considered the state's attempt at alleviating the fiscal problems of local agencies following the passage of Proposition 13 as a factor in deciding the issue of impairment of contract.

employees, and subdivision (g) states that a county charter making such provisions shall supersede inconsistent state laws.[19]

There can be no doubt that there is a conflict between the provision of section 16280 invalidating wage increases agreed to by cities and counties and the ordinances or resolutions of the local agencies which ratified the agreements.

■ It has long been settled that, insofar as a charter city legislates with regard to municipal affairs, its charter prevails over general state law. (E.g., *Ex Parte Braun* (1903) 141 Cal. 204, 209 [74 P. 780]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 291 [32 Cal.Rptr. 830, 384 P.2d 158].) However, as to matters of

[19]Article XI, section 5, provides: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.

"(b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

Section 4 provides in part, "County charters shall provide for:

" . . . . . . . . . . . .

"(b) The compensation, terms, and removal of members of the governing body. If a county charter provides for the Legislature to prescribe the salary of the governing body, such compensation shall be prescribed by the governing body by ordinance.

"(c) Other officers, their election or appointment, compensation, terms and removal.

" . . . . . . . . . . . .

"(f) The fixing and regulation by governing bodies, by ordinance, of the appointment and number of assistants, deputies, clerks, attaches, and other persons to be employed, and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal.

"(g) Whenever any county has framed and adopted a charter, and the same shall have been approved by the Legislature as herein provided, the general laws adopted by the Legislature in pursuance of Section 1(b) of this article, shall, as to such county, be superseded by said charter as to matters for which, under this section it is competent to make provision in such charter, and for which provision is made therein, except as herein otherwise expressly provided."

statewide concern, charter cities remain subject to state law. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61-62 [81 Cal.Rptr. 465, 460 P.2d 137].) Similar rules apply to charter counties. (E.g., *Pearson* v. *County of Los Angeles* (1957) 49 Cal.2d 523, 535 [319 P.2d 624].)

What constitutes a strictly municipal affair is often a difficult question; ultimately it is an issue for the courts to determine. In *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63, we made it clear that while a court will accord great weight to the purpose of the Legislature in enacting general laws which disclose an attempt to preempt the field to the exclusion of local regulation, the fact that the Legislature has chosen to deal with a problem on a statewide basis is not determinative of whether the statute relates to a statewide concern.

Section 16281 contains not only a statement of legislative intent, but a declaration that the section relates to matters of statewide concern and supersedes inconsistent provisions in the charters of local entities.[20] In view of the rule that the Legislature is not the final arbiter as to what constitutes a matter of statewide concern, this declaration cannot be deemed controlling.

As we note above, subdivision (b) of section 5 of article XI expressly grants "plenary authority" to cities to provide in their charters for the compensation of their employees.[21] We recently held in *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 132 [109 Cal.Rptr. 849, 514 P.2d 433], with regard to another matter over which section 5 gives charter cities plenary authority (i.e., the qualifications of employees) that "this is not the usual case in which the courts are without constitutional guidance in resolving the question whether a subject of local regulation is a 'municipal affair' and hence within the general home rule power vested in charter cities by subdivision (a) of section 5, article XI of the Constitution [citation]. Here we have the benefit of. a specific directive in subdivision (b) of that section, which grants 'plenary authority' to charter cities to prescribe in their charters the 'qualifications' of their employees." We held that a state

---

[20] The final paragraph of section 16281 provides: "The Legislature further finds and declares that this chapter constitutes a matter of statewide concern, and shall apply to charter counties and charter cities. The provisions of this chapter shall supersede any inconsistent provisions in the charter of any county or city."

[21] The charters of respondents City of Long Beach, County of Santa Clara, and County of Los Angeles, contain provisions authorizing their governing bodies to determine the salaries of their employees.

statute which prohibited charter cities from prescribing municipal residence requirements in their charters contravened this provision.

But even before section 5 of article XI was amended in 1970 to expressly provide "plenary authority" to charter cities over compensation paid their employees, it was held that the salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws. (E.g., *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384, 389 [10 P.2d 785] [overruled on other grounds in *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 585-586 (79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194)]; *Popper* v. *Broderick* (1899) 123 Cal. 456, 460-462 [56 P. 53]; *Trefts* v. *McDougald* (1911) 15 Cal.App. 584, 586-588 [115 P. 655]; *Burke* v. *Board of Trustees etc.* (1906) 4 Cal.App. 235, 238-239 [87 P. 421]; see also *Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 443-444 [190 P.2d 665].) ■ It seems clear to us, therefore, that both the language of the Constitution and prior authority support the proposition advanced by petitioners that the determination of the wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern.

Respondents assert that the principles relied upon by petitioners apply only if the issue is whether local entities are authorized to determine the compensation of their employees in the absence of a conflict with state law, but that whenever such a conflict exists the question whether the state statute regulates a matter of statewide concern "must be determined from the legislative purpose in each individual instance." (Citing *Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276, 294.) This argument is without merit. Not only do the first four cases cited in the paragraph above involve a conflict between state and local laws in which the local laws were held to prevail, but in a recent case we cautioned against reliance upon the language quoted by respondents from *Professional Fire Fighters* as a measure of the Legislature's power to affect local concerns.[22]

But respondents' main reliance in support of their assertion that the substance of section 16280 constitutes a matter of statewide concern is the purported fiscal emergency discussed above. Although not entirely clear, the gravamen of their argument appears to be that even if the

---

[22]In *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, we held that the statement that whether a matter is of statewide concern " 'must be determined from the legislative purpose in each individual instance' " cannot be interpreted to mean that the Legislature is the final arbiter of what constitutes a matter of statewide concern. (Fn. 6 at p. 63.)

determination of compensation to be paid to employees of charter cities and counties is ordinarily a matter of local concern, the consequences of allowing local governments to exercise these powers in the present circumstances would result in serious statewide problems in view of the alleged 22 percent reduction in revenues available to local entities. Thus, they contend, the question of whether local employees should be granted increases in wages is a matter of statewide concern, and the provisions of section 16280 prevail over local laws.

While this reasoning is debatable, we need not decide the issue, as respondents have failed to establish the fundamental premise of their argument. As is true with respect to the issue of impairment of contracts, respondents ground their claim upon the existence of a statewide emergency. We have demonstrated that they have not established that such a calamitous emergency exists and we therefore reject the argument that section 16280 prevails over the salary ordinances and resolutions enacted by charter cities and counties.

### III

Petitioners also challenge the constitutionality of section 16280.5. That section contains provisions similar to section 16280, and applies to elected or appointed noncivil service officers.[23] For the reasons stated above, section 16280.5 is also unconstitutional insofar as it invalidates contracts between such officers and local public agencies.

### IV

Several questions remain. The first is whether the condition in sections 16280 and 16280.5 that state funds are to be granted only to those local agencies which do not pay salary increases may be upheld in spite of

---

[23]Section 16280.5 provides: "No state funds from the state surplus or state loan funds shall be available to any local public agency which provides an increase in salary in the 1978-79 fiscal year to any elected or appointed noncivil service officer of the local public agency.

"Any provision of a contract or agreement between a local public agency and an elected or appointed noncivil service officer of the local public agency which provides for an increase in salary is null and void.

"As used in this section, the term 'salary' shall not include any compensation other than wages or salaries, such as health benefits, retirement benefits, life insurance, vacation time, sick leave, perquisites of all kinds, and reimbursement of expenses."

While the section by its own terms does not limit wage increases to those granted to state employees, section 5705 of the Welfare and Institutions Code states this limitation with respect to the officers covered by section 16280.5.

our conclusion that the provision invalidating agreements for such increases is unconstitutional. It is too well established to require extensive citation of authority that, while the state may impose conditions upon the granting of a privilege, including restrictions upon the expenditure of funds distributed by it to other governmental bodies (e.g., *Paving Imp. Dist. No. 51 of Texarkana* v. *Refunding Board* (1935) 191 Ark. 838 [88 S.W.2d 50, 52]; see *Caulfield* v. *U.S. Department of Agriculture* (5th Cir. 1961) 293 F.2d 217, 221), "constitutional power cannot be used by way of condition to attain an unconstitutional result" (*Western Union Telegraph Co.* v. *Foster* (1918) 247 U.S. 105, 114 [62 L.Ed. 1006, 1016, 38 S.Ct. 438, 1 A.L.R. 1278]). Thus, while the state may not have been under an obligation to distribute state funds to local agencies to assist them in resolving whatever fiscal problems were contemplated in the wake of Proposition 13, it could not require as a condition of granting those funds that the local agencies impair valid contracts to pay wage increases.

This conclusion raises the issue whether the condition stated in sections 16280 and 16280.5 nevertheless applies to employees and officers of local entities operating under general laws who do not have contractual rights to an increase in wages. No contractual impairment or violation of the home rule provisions has occurred with respect to such employees, but it is urged that to deny them an increase because of these provisions would amount to a denial of due process and equal protection of the laws, and would be contrary to the Legislature's intent.

We are persuaded by the claim that the Legislature intended to treat all local government employees and officers in a uniform manner, and that to distinguish in the application of the condition between employees who had a contractual right to a wage increase and those who did not, or between employees of charter cities and counties and those operating under general laws would violate that intention. Thus, the condition is also invalid as applied to general law city and county employees who were not entitled to a wage increase by contract.

It remains to be decided whether the invalid provisions discussed above may be severed from the remainder of the statute in which they appear. As we have seen, sections 16280 and 16280.5 are part of an act which contains a comprehensive plan to alleviate the fiscal problems of local agencies caused by the passage of Proposition 13. Notably, the act provides for the distribution of more than $5 billion in state funds to local agencies. (§ 16250 et seq.) The respondent local entities vigorously urge

that the unconstitutional provisions of the act are severable from the remainder, and that they are entitled to the distribution of state funds without the invalid restrictions.

The statute contains a severability clause.[24] Such a clause, and the ability to mechanically sever the unconstitutional portions of a statute will ordinarily allow severance, but that process is not compelled unless the remainder of the statute " 'is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.' " (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330-331 [118 Cal.Rptr. 637, 530 P.2d 605].)

In our view, the requirements for severance are met here. The unconstitutional portions of sections 16280 and 16280.5 may be mechanically severed from the remainder of the section and the other provisions of the act. The invalid provisions constitute only a minute portion of a lengthy, detailed, and comprehensive measure designed to afford fiscal relief to local agencies by the distribution of the state surplus. Respondents point to nothing in the history of the measure which indicates that the Legislature, with sufficient funds available in the state treasury to relieve the financial predicament of local agencies, would withhold its assistance if the local entities were prohibited by law from breaching their obligations to provide wage increases. The basic objective of the rescue plan would clearly be promoted by a determination that the unconstitutionality of the provisions challenged in these proceedings does not invalidate the entire legislative design.

## V

It is noteworthy that the respondent local entities (aside from the County of Monterey), either concur in the contentions made by petitioners or interpose only a pro forma challenge to those arguments. The local agencies do not claim that there is any reason why they cannot comply with the requirements of their contracts aside from the fact that under section 16280 and 16280.5 they would lose the benefit of essential state funds. Furthermore, it appears that a number of local entities, including some of the larger employers (e.g., County of Los Angeles, City of Los Angeles, City of Long Beach) have set aside reserves to pay the

---

[24]"If any section, part, clause or phrase of this act is for any reason held to be invalid or unconstitutional, the remainder of the act shall not be affected but will remain in full force and effect." (Stats. 1978, ch. 332, § 33.)

wage increases called for in their contracts should they be compelled to do so.

Since sections 16280 and 16280.5 are unconstitutional in the respects noted above, petitioners are entitled to writs of mandate to compel the local entity respondents to pay the wage increases they seek for 1978-1979.

Petitioners also seek interest from July 1, 1978, on the wages withheld. Prejudgment interest is not allowed if the debtor "is prevented by law . . . from paying the debt." (Civ. Code, § 3287.) As the local entity respondents make abundantly clear, the practical effect of sections 16280 and 16280.5 was to prevent them from paying the increases called for in the contracts, for failure to comply with the condition we now hold to be invalid would have required them to renounce state surplus funds, resulting in serious financial hardship.[25]

Let a peremptory writ of mandate issue directing respondent local entities to pay to their officers and employees the salary increases provided in the 1978-1979 agreements without regard to the invalid restrictions contained in sections 16280 and 16280.5.

Tobriner, Acting C. J., Clark, J., Richardson, J., Manuel, J., Newman, J., and Taylor, J.,* concurred.

---

[25]Petitioners California Association of Professional Employees, AFL-CIO and Sonoma County Organization of Public Employees request that attorney's fees be awarded from the funds recovered by employees represented by them. We discern no justification for such an award. Nor are petitioners entitled to attorney's fees under section 800 of the Government Code. That provision applies only to actions to review administrative proceedings, and is therefore inapposite here.

*Assigned by the Acting Chairperson of the Judicial Council.