**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

QWEST COMMUNICATIONS INC.,
  *Plaintiff-Appellee,*

  v.

CITY OF BERKELEY; CITY
COUNCIL OF BERKELEY; WELDON
RUCKER, in his official capacity as
Acting City Manager of the City
of Berkeley; PHIL KAMLARZ, in his
official capacity as Deputy City
Manager of the City of Berkeley,
  *Defendants-Appellants.*

No. 03-15852

D.C. No.
CV-01-00663-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
December 6, 2005—San Francisco, California

Filed January 12, 2006

Before: Stephen S. Trott, Thomas G. Nelson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Trott

## COUNSEL

Jeffrey T. Melching, Rutan & Tucker, LLP, Costa Mesa, California, for the defendants-appellants.

David R. Goodnight, Stoel Rives, LLP, Seattle, Washington, for the plaintiff-appellee.

John H. Ridge, Stoel Rives, LLP, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

TROTT, Circuit Judge:

The City of Berkeley appeals the district court's summary judgment ruling that its Interim Telecommunication Carriers Ordinance is preempted by the Federal Telecommunications Act of 1996 ("Act"). The district court ruled that the Interim Telecommunication Carriers Ordinance is preempted by the Act because the ordinance imposed an onerous burden on telecommunications providers seeking entry into the telecommunications market in Berkeley. The court held also that the ordinance is not saved by the Act's "safe harbor" clause because the regulations that create this prohibiting effect do not merely regulate the City of Berkeley's public rights-of-way but regulate the telecommunications companies themselves. We come to the same conclusions as the district court and, therefore, AFFIRM the district court's judgment.

**I**

**BACKGROUND**

In 1996, Congress passed the Federal Telecommunications Act. The full title of the Act is "An act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunication technologies." As indicated by the title, the purpose of the act was to reduce regulation of telecommunications providers by creating a "procompetitive, de-regulatory national policy framework." H.R. Rep. No. 104-458 (1996) (Conf. Rep.). The Act was later codified in 47 U.S.C. § 253. Section 253 furthers this de-regulatory purpose by precluding states and municipalities from passing laws that "prohibit or have the effect of prohibiting the ability of any entity" from providing telecommunications services. 47 U.S.C. § 253(a). This preemption is not absolute. Section 253 also includes a

"safe harbor" clause that allows state and local government "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers" so long as the management and compensation is done on a "competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c).

In December 1999, Qwest Communications Corporation ("Qwest") won a competitive bidding process to provide faster and expanded telecommunications capacity to Lawrence Berkeley National Laboratory ("LBNL") located in the City of Berkeley, California ("City"). In order to upgrade LBNL's telecommunications capacity, Qwest needed to install a "local loop" between LBNL and Qwest's central system. This involved laying a conduit through the City's public rights-of-way. From March through December 2000, Qwest and the City negotiated and developed an acceptable construction plan to lay the conduit in the public rights-of-way. On July 10, 2000, Qwest presented an application for the permits necessary to begin work on LBNL conduits. However, on July 25, 2000, the Berkeley City Council adopted Resolution No. 60,729-N.S., declaring a moratorium on telecommunications infrastructure work with exceptions for emergency and hardship cases. As a result, the City stopped issuing excavation permits for telecommunications infrastructure work and Qwest was unable to obtain the necessary permits to begin construction.

On December 22, 2000, the City enacted Ordinance No. 6608-N.S. ("Ordinance 6608") to regulate telecommunications companies and their use of the public rights-of-way. On February 13, 2001, Qwest filed suit against the City arguing in part that Ordinance 6608 was preempted under federal and state law. Qwest also sought temporary injunctive relief. In May 2001, the district court enjoined the City from enforcing Ordinance 6608. Following the court's ruling, the City passed Resolution No. 61,102-N.S., adopting Ordinance No. 6630-N.S. ("Ordinance 6630") to replace Ordinance 6608. In

response, Qwest amended its complaint to challenge Ordinance 6630 in addition to Ordinance 6608. On April 7, 2003, the district court ruled that Ordinances 6608 and 6630 were preempted by § 253. The City appealed the district court decision with regard to only Ordinance 6630.

## II

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *See Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004). Thus, our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *See Olsen v. Idaho St. Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## III

## DISCUSSION

**[1]** Under the Supremacy Clause of the United States Constitution, Congress may preempt state law through federal legislation. U.S. Const. art. VI, § 2; *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317-18 (1981). Congress can preempt state law through legislation in several ways. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). One way is to expressly state an intention to preempt, *id.*, as Congress has done with § 253(a): "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *See*, *e.g.*, *Metrophones Telecomm., Inc. v. Global Crossing*, 423 F.3d 1056, 1071-72 (9th Cir. 2005). We have interpreted this preemptive language to be clear and "virtually absolute" in restricting municipalities to a "very limited and proscribed role in the regulation of telecommunications." *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175

(9th Cir. 2001) (internal quotation marks omitted). The narrowly circumscribed role is set forth in § 253(c). This "safe harbor" clause permits state and local government control over the use of the rights-of-way, so long as the control is management of the rights-of-way itself and not control of the telecommunications companies with facilities in the rights-of-way. *Id.* at 1177.

## A.   Preemption: § 253(a)

Before considering whether Ordinance 6630 falls within the "safe harbor," we must determine whether the ordinance's regulations fall within the preemptive language of § 253(a). The City argues Qwest failed to produce any facts showing how any section or combination of sections of Ordinance 6630 does what § 253(a) precludes—prohibiting or having the effect of prohibiting telecommunications services. Specifically, the City contends that Qwest must show the actual impact of Ordinance 6630 on Qwest's ability to provide telecommunications services. However, we explicitly rejected this argument in *Qwest Corp. v. City of Portland*:

> The district court noted that Qwest has not pointed to a single telecommunications service that it, or any other entity, is effectively prohibited from providing because of the Cities' revenue-based fees or any of the other challenged requirements. We do not agree that Qwest was required to make an actual showing of a single telecommunications service that it . . . is effectively prohibited from providing. We have previously ruled that regulations that *may* have the effect of prohibiting the provision of telecommunications services are preempted.

385 F.3d 1236, 1241 (9th Cir. 2004) (citations and quotation marks omitted).

Consequently, rather than considering the actual impact of Ordinance 6630, we must determine whether the specific reg-

ulations of Ordinance 6630 "may have the effect of prohibiting the provision of telecommunications services" in the City. *Id.* As explained below, the regulations of Ordinance 6630 have that prohibiting effect.

### 1. Section 16.11.070

**[2]** Section 16.11.070 of Ordinance 6630 requires telecommunications companies using the public rights-of-way to pay what the City refers to as a "non-cost based compensation fee." In *Auburn*, we stated that fees "not based on the costs of maintaining the [public rights-of-way], as required under the Telecom Act" contributed to a regulatory scheme that had the impermissible effect of precluding telecommunications companies from providing services. 260 F.3d at 1176.

In *Portland*, 385 F.3d at 1242, we questioned whether this language stood for the proposition that all non-cost based fees would be automatically preempted. That questioning is reasonable based on the text and organization of § 253 that require an individualized determination of whether the regulation prohibits or may have the effect of prohibiting the provision of telecommunications services before determining whether the regulation is saved by the "safe harbor" clause of § 253. Thus, we decline to read *Auburn* to mean that all non-cost based fees are automatically preempted, but rather that courts must consider the substance of the particular regulation at issue.

**[3]** The City makes no attempt to assert that its non-cost based fee is not the type of regulation that prohibits or may have the effect of prohibiting the provision of telecommunications services. Instead, the City asserts that section 16.11.070 escapes preemption because it allows telecommunications companies protected by § 253(a) to be excluded from paying this fee by complying with the "common carrier exemption procedure." Ordinance 6630 § 11.16.070(D).

**[4]** However, the "common carrier exemption procedure" is not a simple process. The City's own witness described the exemption as a "very exhaustive process" that requires the applicant company to provide extensive information about the company and the specific project. Although not identical to the franchise application process in *Auburn*, the exemption process in this case is similarly onerous and, therefore, has the same discouraging effect.

To begin with, section 11.16.070(D)(1) requires the applicant seeking exemption to identify its qualifications to provide telecommunications services and to certify that it is in compliance with state and federal laws. This includes compliance with state environmental law as well as federal and state tariffing and detariffing requirements. Section 11.16.070(D)(1) also requires the applicant to disclose to the City and the public the material terms of "any and all agreements, tariffs, or other documents relating to" telecommunications services provided by the applicant.

In addition, section 16.11.070(D)(2) requires the applicant to provide the City with an annual written report that includes the following information: (1) current rate information and information regarding terms and conditions "upon the services being furnished on or over the facilities located within the public rights-of-way;" (2) copies of all information made available to the public pursuant to the tariffing, detariffing, and related notice requirements of federal and state law, including copies of all negotiated contracts related to the provision of telecommunications services; (3) the name, address, and phone number of each person or entity to whom the telecommunications provider denied service, access to, or capacity over the facilities during the preceding year and reasons for the denial; (4) copies of any contracts effecting the transfer of the ownership, operation or control of the telecommunications company's facilities or systems.

Finally, section 16.11.070(D)(4) requires that the applicant allow the city "at any time, and from time to time, and upon

reasonable notice" to audit the applicant's books and records to determine whether the applicant is "continuing to furnish requisite" services in conformity with federal regulations "to qualify for exemption from licensing, franchising, and related provisions of [Ordinance 6630]" and whether the applicant is acting within the scope of its certification.

**[5]** These requirements, particularly when considered together, are patently onerous and have the effect of prohibiting Qwest and other telecommunications companies from providing telecommunications services.

### 2. Sections 16.11.060 and 16.11.330

**[6]** The onerous nature of the regulations of section 16.11.070 is compounded by other sections. Section 16.11.060(B)(6) allows the City to deny an excavation permit and thus the use of public rights-of-way if the applicant fails to comply with any other requirement of the ordinance, including the onerous provisions of section 16.11.070. Further, section 16.11.060 affords the City significant discretion to deny companies the ability of providing telecommunications services. These provisions, which are similar to those at issue in *Auburn*, contribute to an impermissible regulatory scheme. *See Auburn*, 260 F.3d at 1178-79.

**[7]** Section 16.11.330 similarly contributes to an impermissible regulatory scheme by allowing the City to impose civil and criminal penalties for not complying with any requirement of Ordinance 6630. *See Auburn*, 260 F.3d at 1176. When read together, sections 16.11.060, 16.1130, and 16.11.070 contribute to a regulatory structure that may have the effect of prohibiting telecommunications companies from providing services.

### B. Safe Harbor: § 253(c)

Because sections 16.11.070, 16.11.060 and 16.11.330 have the effect of prohibiting telecommunications services, the

ordinance falls within the preemptive language of § 253(a). These regulations, however, will not be preempted if they meet the "safe harbor" requirements found in § 253(c). The City argues that even if Ordinance 6630 contains regulations that have an impermissive effect, the regulations are properly related to the City's legitimate interests in public rights-of-way management and are, therefore, saved by § 253(c). This argument misconstrues our case law interpreting § 253(c).

**[8]** As set forth in *Auburn*, the phrase "manage the public rights-of-way" means "control over the right-of-way itself, not control over companies with facilities in the right-of-way." *Auburn*, 260 F.3d at 1177. Proper management activities include "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them." *Id.* at 1177 (quoting *In re TCI Cablevision of Oakland County, Inc.*, 12 F.C.C.R. 21396 (F.C.C. 1997), ¶ 103). In contrast, regulations requiring "the applicant [to] submit proof of its financial, technical, and legal qualifications do not regulate the public rights-of-way" are impermissible. *Id.* at 1178 (internal citations and quotation marks omitted).

**[9]** Here, the City's regulations identified in the § 253(a) analysis are not saved by § 253(c)'s "safe harbor" because they go to an applicant's technical and legal qualifications rather than the actual management of the public rights-of-way itself.

For instance, an applicant is required to identify its state and federal qualifications and furnish annual documentation that it provides telecommunications services and is in compliance with state and federal environmental and telecommunications law. Ordinance 6630 § 16.11.070(D)(1). The applicant is required also to provide yearly documentation regarding current rate information, tariffing, and detariffing, as well as

copies of all contracts relating to the applicant's provision of services. Ordinance 6630 § 16.11.070(D)(2). If the applicant violates these provisions, the City may deny the applicant an excavation permit, effectively preventing the applicant from using the public rights-of-way and providing services. Ord. 6630 § 16.11.060. Even after the applicant has been granted access to the public rights-of-way, the applicant is subject to having its books and records audited to ensure the veracity of the applicant's submissions regarding an applicant's technical and legal qualifications under federal and state law, with the potential for criminal and civil penalties in the event that something is inaccurate. These requirements do facilitate the City's control over the public rights-of-way but are attempts to regulate and control the companies by requiring certification and documentation of their legal and technical status. Following our reasoning in *Auburn*, we conclude that these regulations are not protected by § 253(c) and are, therefore, preempted.

## C.   Severability

**[10]** Ordinance 6630 contains a severability clause. Section 16.11.260 states that if any part of the ordinance is declared invalid, the invalidity will not affect the permissible parts of the ordinance. To determine whether this language is effective and the invalid provisions of Ordinance 6630 are severable, we look to state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under California law, the presence of a severability clause coupled with the ability functionally, mechanically, and grammatically to sever the invalid portion from the valid portions of an enactment ordinarily will allow severance but only if the remainder of the enactment is complete in itself and would have been adopted without the invalid portion. *Sonoma County Org. of Pub. Employees v. County of Sonoma*, 591 P.2d 1, 14 (Cal. 1979); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1256 (Cal. 1989).

**[11]** Here, it does not appear that the invalid portions of the ordinance can be severed from the valid provisions of the

ordinance without affecting the general functionality of the ordinance. Removing the preempted regulations found in sections 16.11.070, 16.11.060, and 16.11.330 would result in a disjointed and nonsensical fee exemption process, annual reporting system, and certification process.

**[12]** More problematic is whether Ordinance 6630 would have been adopted by the City without the invalid portions of the enactment. In *Sonoma*, the California Supreme Court gave great deference to the purpose and design of the statute. 591 P.2d at 14-15. However, that purpose and design was constitutionally permissible. *Id.* Here, the stated purpose of Ordinance 6630 is to "more specifically regulate telecommunications carriers providing telecommunications and telecommunications services . . . ." This stated purpose is impermissible and in direct conflict with the title and text of § 253. Thus, as we have disemboweled the portions of the ordinance that accomplish this express purpose, there is no evidence—even with the severability clause—that suggests the City would have passed the Ordinance. Accordingly, we decline to sever the invalid portions of Ordinance 6630.

## CONCLUSION

**[13]** We affirm the district court's order granting summary judgment in favor of Qwest. Section 253(a) preempts Ordinance 6630 because the enactment contains regulations and requirements that have the effect of prohibiting telecommunications companies from providing telecommunications services in the City of Berkeley. Furthermore, the offending provisions are not saved by the "safe harbor" clause found in § 253(c) because they are not regulations that manage the public rights-of-way, but regulations that allow the City to manage the telecommunications companies themselves by requiring the companies to certify and document their legal and technical qualifications. We also determine that Ordinance 6630 is not severable.

**AFFIRMED**