[No. A050166. First Dist., Div. Four. Nov. 25, 1991.]

SONOMA COUNTY ORGANIZATION OF PUBLIC/PRIVATE EMPLOYEES, LOCAL 707, SEIU, AFL-CIO, Plaintiff and Respondent, v. COUNTY OF SONOMA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

James P. Botz, County Counsel, Rosemary H. Morgan, Chief Deputy County Counsel, and Richard M. Flores, Deputy County Counsel, for Defendant and Appellant.

Victor J. Westman, County Counsel (Contra Costa), Vickie L. Dawes, Deputy County Counsel, Ronald A. Zumbrun and Anthony T. Caso as Amici Curiae on behalf of Defendant and Appellant.

Van Bourg, Weinberg, Roger & Rosenfeld and Vincent A. Harrington, Jr., for Plaintiff and Respondent.

## OPINION

**PERLEY, J.**—The primary question presented is whether a concerted series of intermittent work stoppages by public employees can constitute an emergency which exempts the public agency employer from the "meet and confer" obligation imposed by the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.).[1] Our answer is yes.

### BACKGROUND

In the summer of 1989, the County of Sonoma (County) was negotiating a new labor contract with its workforce, the majority of whom were represented by the Sonoma County Organization of Public/Private Employees (SCOPE). Dissatisfied with the progress of the negotiations, the employees began to subject the County to job actions at county facilities. These job actions, which commenced on July 7th, took a variety of forms, most notably what the County administrator termed "a series of unpredictable rolling sickouts and strikes . . . . occur[ring] on a sporadic and erratic basis."[2] The County administrator prepared a report detailing the "unauthorized absences" on a day-by-day basis for the affected departments. Even with its undecipherable bureaucratic acronyms and designations, the report gives a feel for the scope and development of the "rolling sickouts":

---

[1]Statutory references are to the Government Code unless otherwise indicated. For purposes of simplicity, the Meyers-Milias-Brown Act will hereinafter be abbreviated as the MMBA.

[2]Reporting to the County's board of supervisors, the County administrator listed the following additional examples of "inappropriate and disruptive behavior in the workplace" engaged in by employees: "[E]mployees . . . taking 10 minute 'breaks' each hour to join picket lines protesting the County's latest contract offer. [¶] . . . [E]mployees . . . gathering groups of employees together during work hours to encourage them to engage in job actions against the County. [¶] Numerous incidents involving call forwarding of County phone lines to other County departments. [¶] A number of incidents involving employees making phone calls and/or utilizing copy machines, etc., for job action related activities."

July 7th—Building Inspection Department; clerical workers in the Sheriff's Department[3]

July 8th—Community Hospital

July 9th—Community Hospital

July 10th—Community Hospital; Mental Health Department; and "Fairgrounds Maintenance"

July 11th—Community Hospital

July 12th—Community Hospital; the Public Health and Social Services departments

July 13th—Community Hospital; the Public Works and Social Services departments

July 14th—Community Hospital; Public Health and Public Works departments; County Clerk, Probation, Assessor, and District Attorney offices

July 15th—Community Hospital

July 16th—Community Hospital

July 17th—Community Hospital; Public Works and Public Health departments; Probation Office

July 18th—Community Hospital

July 19th—Community Hospital; Mental Health Department; Water Agency; clerical workers at "Adult Detention"

July 20th—Water Agency; Auditor and Recorder's offices; "Clerical & Aides" at "Adult Detention"; "Central Info Bureau" at the Sheriff's Department; Mental Health Department; "Hospital-Nursing" and "Other Hospital Units"

The County administrator summarized the deleterious consequences of the situation: "These rolling job actions . . . have in some instances significantly impaired operations of departments experiencing such job actions.

---

[3]The record does not establish whether actual peace officers ever engaged in a "sickout" or, indeed, whether deputies are among the employees represented by SCOPE. Similarly, nothing establishes that firefighters were engaged in job actions against the County.

Because department heads do not know from day to day who will show up to work, they encounter great difficulty in utilizing temporary replacement employees necessary to continue public services."

Confronting this conclusion, on July 21st, the County's board of supervisors unanimously adopted Ordinance No. 89-4040.[4] Labeled an urgency measure effective immediately, the Ordinance was declared necessary "to protect the public health and safety" and "to prevent the substantial impairment of County departmental operations."[5] The means chosen to achieve these ends was vesting department heads with the authority to place employees participating in an "intermittent work stoppage" on "administrative unpaid absence." This would be done only after the employee had been warned and thereafter "engaged in an intermittent work stoppage [which] the department head concludes . . . substantially impairs the operation of his or her department, including any division, section or unit." The Ordinance further provided that placement on administrative unpaid absence "is not, and shall not be construed as, disciplinary in nature."

Two days later, on July 23d, the County's employee relations manager sent a letter to SCOPE advising of the Ordinance, and offering "to meet and confer over this item . . . . if you so desire." SCOPE had no such desire, preferring to continue its job actions. The high point of its efforts after passage of the Ordinance occurred on July 25th, when more than half of the County's workforce participated in job actions. Among the county agencies impacted were the public health, mental health, social services, building

---

[4]In its capacity as the board of directors for the Sonoma County Water Agency, the Northern Sonoma Air Pollution Control District, and the community development commission, the board of supervisors adopted a concurrent resolution (No. 89-1364) substantially similar to the ordinance. Both legislative products will hereinafter be collectively referred to as the Ordinance.

[5]As stated in the Ordinance: "SECTION I. PURPOSE. The purpose of this Ordinance is to prevent the substantial impairment of County departmental operations and threats to workplace security by intermittent work stoppages, such as rolling sick-outs and rolling strikes, which result in employees reporting to work on an erratic and unpredictable basis. Currently, . . . SCOPE, a recognized employee organization, is, and has been, engaging in rolling job actions. . . . The nature of these actions and their significant adverse consequences to departmental operations is documented in a report to this Board from the County Administrator [quoted at fn. 2 and following text, *ante*] . . . . The adverse consequences described in the County Administrator's report may be minimized by authorizing and directing department heads to take the actions prescribed herein.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"SECTION 6. FACTS CONSTITUTING URGENCY. A major county employee union is currently engaging in job actions that are disrupting public services as has been more particularly described in the report of the County Administrator referenced in Section 1 of this Ordinance. Accordingly it is necessary that this Ordinance take effect immediately in order to protect the public health and safety and to preserve public funds and property."

inspection, and public works departments; the water agency; the honor farm; the county jail; the "Dependent Home"; juvenile hall; the juvenile court; the juvenile probation department; the family support division of the district attorney's office; and all staff at the hall of justice.[6]

SCOPE and the County agreed to a new contract on August 8th. The following day all SCOPE-represented employees, including the 16 persons who had been placed on unpaid administrative leave pursuant to the Ordinance, returned to work. On August 10th, SCOPE initiated this action by filing a petition for a writ of mandate, alleging that the Ordinance and actions taken pursuant to it were invalid by virtue of the County's failure to meet and confer with SCOPE prior to the Ordinance's adoption as required by the MMBA.

At the conclusion of a hearing conducted in March of 1990, the trial court agreed with SCOPE that (1) no bona fide emergency existed at the time the Ordinance was adopted, (2) therefore the County's noncompliance with the meet-and-confer obligation prior to the adoption was unjustified, and (3) the Ordinance was thus invalid, (4) as were all actions made pursuant to it. A judgment ordering issuance of the peremptory writ is the subject of this timely appeal by the County.

REVIEW

I

A central principle of the MMBA is the obligation of a public agency employer to meet and confer with the recognized employee organization prior to adoption of any measure relating to matters within the employee organization's scope of representation. (§§ 3504.5, 3505.)[7] The MMBA specifies: "The scope of representation shall include all matters relating to

---

[6] This information is taken from a transcription of a recorded message played on a telephone "hotline" maintained by SCOPE to provide daily reports on the dispute's progress to its members.

[7] These statutes provide in pertinent part: "Except in cases of emergency as provided in this section, the governing body of a public agency, and boards and commissions designated by law or by such governing body, shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body or such boards and commissions and shall give such recognized employee organization the opportunity to meet with the governing body or such boards and commissions. [¶] In cases of emergency when the governing body or such boards and commissions determine that any ordinance, rule, resolution or regulation must be adopted immediately without prior notice or meeting with a recognized employee organization, the governing body or such boards and

employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.)

SCOPE argues that the Ordinance implicated "matters relating to employment" within the scope of its representation, thus activating the County's obligation to meet and confer with SCOPE about the Ordinance prior to its adoption. The County responds that it had no such obligation because the Ordinance dealt with subjects outside the ambit of SCOPE's representation.[8] These positions have been earnestly and ably presented by the parties. It is not, however, necessary to decide which side is correct. Even if it was concluded that the Ordinance was a matter within the meet-and-confer requirement, that conclusion would be merely a preliminary step toward the real issue of whether the County's noncompliance was excused by an emergency as expressly contemplated by the MMBA. We therefore proceed directly to consider the validity of the emergency as declared by the County as an integral predicate of the Ordinance.

 The County was not required by the MMBA, or by any other authority, to declare an emergency. Its power to do so is, therefore, plainly a discretionary one. The County's exercise of this undoubted power was to be respected by the trial court unless and until SCOPE proved that the County had abused its discretion. (See *Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 29, 31 [41 Cal.Rptr. 9, 396 P.2d 41]; *Savings and Loan Soc.* v. *San Francisco* (1905) 146 Cal. 673, 678 [80 P. 1086]; *Crown Motors* v. *City of Redding* (1991) 232 Cal.App.3d 173, 179 [283 Cal.Rptr. 356]; *Vernon Fire*

commissions shall provide such notice and opportunity to meet at the earliest practicable time following the adoption of such ordinance, rule, resolution, or regulation." (§ 3504.5.)

"The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of . . . recognized employee organizations . . . and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action. [¶] 'Meet and confer in good faith' means that a public agency, or such representatives *as it may* designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation . . . ." (§ 3505.)

[8]The counties of Butte, Calaveras, Contra Costa, Fresno, Glenn, Kern, Kings, Lake, Madera, Marin, Plumas, San Bernardino, Shasta, Siskiyou, and Trinity appear as amici curiae in support of the County, as does the Pacific Legal Foundation.

*Fighters* v. *City of Vernon* (1980) 107 Cal.App.3d 802, 810 [165 Cal.Rptr. 908].) The trial court, however, determined that because the MMBA "is a state-wide statute of general application which will supercede [*sic*] conflicting local laws, regulations or ordinances," and because any " 'emergency' is an exception to the strong public policy in favor of the meet and confer process," it was the County that should shoulder the burden of proving the existence of an emergency. It is true that a party arguing for an exception to an otherwise applicable general rule can, in a variety of contexts, be required to satisfy the burden of establishing the exception. (E.g., *Geilim* v. *Superior Court* (1991) 234 Cal.App.3d 166 [285 Cal.Rptr. 602] [exception to evidentiary privilege]; *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208 [265 Cal.Rptr. 347] [exception to constitutional taxing restriction]; *Eastwood* v. *Froelich* (1976) 60 Cal.App.3d 523 [131 Cal.Rptr. 577] [exception to statutory rule of liability].) But the trial court failed to appreciate that this particular rule was outweighed by numerous other evidentiary principles.

As the invalidity of the Ordinance was an essential element of its claim for relief, SCOPE would ordinarily be required to carry the burden of proof on this point. (Evid. Code, § 500.) ■ This reflects the long-standing rule that "[i]n passing on the validity of an ordinance . . . it will be presumed that it is valid. He who would claim that it is invalid must assume the burden of showing its invalidity." (*Hopkins* v. *Galland Mercantile L. Co.* (1933) 218 Cal. 130, 133-134 [21 P.2d 553].) That burden includes surmounting all possible intendments, presumptions, and reasonable doubts indulged in favor of the Ordinance's validity. (See *Creighton* v. *City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1021 [207 Cal.Rptr. 78]; *Brown* v. *City of Berkeley* (1976) 57 Cal.App.3d 223, 231 [129 Cal.Rptr. 1]; *City of Industry* v. *Willey* (1970) 11 Cal.App.3d 658, 663 [89 Cal.Rptr. 922].) ■ These were not the only advantages enjoyed by the Ordinance when it was haled into court. The County's determination that there existed an emergency at the time of the Ordinance's enactment, although not conclusive or immune from judicial review (*Burr* v. *San Francisco* (1921) 186 Cal. 508, 513-514 [199 P. 1034, 17 A.L.R. 581]; *San Christina etc. Co.* v. *San Francisco* (1914) 167 Cal. 762, 772-774) [141 P. 384]), is covered by a specific rule dealing with this precise situation: " 'In the absence of evidence to the contrary it will be assumed that a municipal legislative body in enacting an emergency ordinance acted on sufficient inquiry as to whether an emergency existed. Its declaration is prima facie evidence of the fact. Where the facts constituting the emergency . . . are recited in the ordinance and are such that they may reasonably be held to constitute an emergency, the courts will not interfere, and they will not undertake to determine the truth of the recited facts.' (45 Cal.Jur.3d,

Municipalities, § 199, p. 315; fns. omitted.)" (*Northgate Partnership* v. *City of Sacramento* (1984) 155 Cal.App.3d 65, 69 [202 Cal.Rptr. 15]; accord *Crown Motors* v. *City of Redding, supra,* 232 Cal.App.3d 173 at p. 179; see *Spreckels* v. *San Francisco* (1926) 76 Cal.App. 267, 275 [244 P. 919].) These principles restate the presumption of public officers discharging their duties properly (Evid. Code, § 664), which in this case would mean presuming that the board of supervisors did not act without some factual basis. (See *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86, 89 [4 Cal.Rptr. 493, 351 P.2d 765].) As may be gathered from the totality of these rules, the general judicial attitude is one of pronounced deference to the legislative decision. (See *Northgate Partnership* v. *City of Sacramento, supra,* at pp. 71-73; *City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 396-399 [3 Cal.Rptr. 796] and authorities cited.)

Insofar as the trial court may have been warranted in invoking the "prove the exception" rule against the County, that burden was satisfied when the County introduced a copy of the Ordinance. The recitals contained therein declaring the existence of the emergency constituted prima facie evidence of the fact of the emergency. (*Crown Motors* v. *City of Redding, supra,* 232 Cal.App.3d 173 at p. 179; *Northgate Partnership* v. *City of Sacramento, supra,* 155 Cal.App.3d 65 at p. 69.) Once the County had done so, SCOPE should have been required to overcome the evidentiary burdens and presumptions discussed above. (See Evid. Code, § 606; *Hollander* v. *Denton* (1945) 69 Cal.App.2d 348, 351-352 [159 P.2d 86].) It thus appears that the trial court erred in inverting the correct approach and thereby relieving SCOPE of its burden of proving the Ordinance invalid. Completely lacking is anything resembling a deferential attitude to the Ordinance by the court. This error may have contributed to a fatal skewing of the trial court's perspective (cf. *Truesdale* v. *Workers' Comp. Appeals Bd.* (1987) 190 Cal.App.3d 608, 613 [235 Cal.Rptr. 754]) at the outset of its determination whether it had been proven there was an emergency.

■ "The word 'emergency' as used in legislative enactments does not always have precisely the meaning ascribed to it by lexicographers. It may be defined by the statute or ordinance. If so, an interpretation thereof must be confined to and limited by such definition and the subject matter enacted." (*Fennessey* v. *Pac. Gas & Elec. Co.* (1942) 20 Cal.2d 141, 143 [124 P.2d 51] [citation omitted].) Just what shall constitute an emergency is left unexplained by the MMBA. This omission is of no moment, given that emergency has long been accepted in California as an unforeseen situation calling for immediate action. (See e.g., *id.* at pp. 143-144; *San Christina etc. Co.* v. *San Francisco, supra,* 167 Cal. 762, 773; *Rutherford* v. *State of*

*California* (1987) 188 Cal.App.3d 1267, 1280 [233 Cal.Rptr. 781]; *Stevens* v. *Board of Education* (1970) 9 Cal.App.3d 1017, 1022 [88 Cal.Rptr. 769] and authorities cited.) This is "the meaning of the word that obtains in the mind of the lawyer as well as in the mind of the layman." (*San Christina etc. Co.* v. *San Francisco, supra,* at p. 773.)

It is a considerably harder task to specify identifying characteristics of an emergency, given that "[t]he term depends greatly upon the special circumstances of each case." (*Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 356 [291 P. 839, 71 A.L.R. 161].) Not only must urgency be present, the magnitude of the exigency must factor. We agree with the trial court that an emergency may well be evidenced by an imminent and substantial threat to public health or safety. (See § 54956.5, subd. (a); *County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 586, 592 [214 Cal.Rptr. 424, 699 P.2d 835].) Certainly this is an important—perhaps the most important—criterion if the emergency involves a public sector labor dispute, although we are disinclined to view it as a sine qua non. Without question, an emergency must have "a substantial likelihood that serious harm will be experienced" (*Dow Chemical Co.* v. *Blum* (E.D. Mich. 1979) 469 F.Supp. 892, 902) unless immediate action is taken. The anticipation that harm will occur if such action is not taken must have a basis firmer than simple speculation. (See *People* v. *Weiser* (Colo.App. 1989) 789 P.2d 454, 456; *Senn Park Nursing Center* v. *Miller* (1983) 118 Ill.App. 733, [74 Ill.Dec. 132, 455 N.E.2d 162, 168].) Emergency is not synonymous with expediency, convenience, or best interests (*Hunt* v. *Norton* (1948) 68 Ariz. 1 [198 P.2d 124, 130, 5 A.L.R.2d 668]; *State* v. *Hinkle* (1931) 161 Wash. 652 [297 P. 1071, 1072]), and it imports "more . . . than merely a general public need." (*Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 13].) Emergency comprehends a situation of "grave character and serious moment." (*San Christina etc. Co.* v. *San Francisco, supra,* 167 Cal. 762 at p. 773.)

█ Application of these principles establishes that the trial court erred in disputing the County's determination that there was an emergency warranting immediate adoption of the Ordinance. It must be conceded at the outset that the evidence (virtually all of which was produced by the County) shows that the County was not responding to fanciful speculation. The evidence is uncontradicted that the County was the target of a series of job actions by SCOPE's members. The evidence is also undisputed that these job actions (with one exception to be noted in the next paragraph) were directed at a variety of county agencies and departments apparently selected at random. The most common form of job action was an unannounced absence of

workers from the department(s) on a day-to-day basis. As made clear by the County administrator's report, the County's inability to know or predict which county agencies would be affected undoubtedly impaired the County's ability to deploy substitute personnel and thus maintain the usual myriad of public services that are the responsibility of county governments in this day and age. Without question, SCOPE's job actions had an impact.

But for the job actions to constitute an emergency requires proof of dislocation possessing a qualitative dimension that goes beyond irritation and inconvenience. That dimension was provided by SCOPE's persistent focus upon the County's public health facilities. In the two-week period immediately preceding passage of the Ordinance the County's public health and mental health departments were each subjected to three 1-day "sick-outs." Representative was what occurred at the mental health department on July 10th, as described in the County administrator's report to the board of supervisors: Absent were 4 of 15 workers in "Administration"; 6 of 13 workers in "Outpatient"; 4 of 10 workers in "Continuing Care"; all 9 workers on the "day shift" and 5 of 7 workers on the "PM shift" at "Inpatient"; and 2 of 3 workers on the "midnight shift" and 3 of 4 workers on the "day shift," as well as the sole cook, at "Alcohol Services."

The centerpiece of SCOPE's campaign was the community hospital. It endured job actions for all but two of the fourteen days immediately preceding the Ordinance's passage. The absences show a quilt-like pattern of disruption. For example, on July 10th, 17 of 24 lab workers failed to appear for work; the County administrator noted less dramatic levels of absenteeism during the night shifts in "Newborn Nursery," "Obstetrics," "Med. Surgical 3," and "Respiratory Services." The following day the emphasis shifted to the day shifts; 9 of 11 workers in "Obstetrics," all 4 workers in "Newborn Delivery," and 2 of 5 in "Labor & Delivery" failed to appear. The next day some workers did not report to the "CCU [Critical Care Unit]." On July 17th, 24 of 55 workers on the day shift at "Family Practice" were absent. The high point was reached on July 19th, when 118 of 150.5 workers on the 3 shifts did not report for work. And the following day, 1 day before the Ordinance was passed, 41 of 52.5 nurses on the day shift stayed home. That these actions were muscle-flexing exercises designed to impress the County with SCOPE's power and seriousness is beyond dispute. So too is the considerable distress they caused—SCOPE's own "hotline" (see fn. 6, *ante*) advised its members that "Community Hospital has been evacuating patients and closing down certain areas of the Hospital" because of the SCOPE's job action.

Although the precise point is new to California, other jurisdictions have had experience with interruptions in the orderly delivery of medical services

that were treated as emergencies. (See *Miller v. County of Breckinridge* (Ky. 1962) 361 S.W.2d 283; *Olson v. City of Highland Park* (1946) 312 Mich. 698 [21 N.W.2d 286]; *State v. State Board of Examiners* (1934) 97 Mont. 441 [35 P.2d 116].) Presenting no authority to the contrary, SCOPE is unable to persuade us to diverge from this unanimity. The County's medical facilities are staffed by workers whose "particular jobs . . . require unique skills and training," and "whose absence from their duties would clearly endanger the public health and safety" (*County Sanitation Dist. No. 2 v. Los Angeles County Employees' Assn., supra,* 38 Cal.3d 564 at pp. 586-587 [text & fn. 35]), as nowhere more eloquently recognized by SCOPE itself in the "hot-line" comment just quoted.

The forecasting of imponderables should not be paralyzed for fear of being judged incorrect with the benefit of hindsight. Barring the unimaginable—a situation where a work stoppage is the incontestable proximate cause of casualties—a margin for error must be allowed. The possibility of misestimation inheres in the concept of a perceived peril's imminence, in the discretionary nature of the power to declare an emergency, and in the deference courts must accord such a determination by the responsible legislative body. (See *County Sanitation Dist. No. 2 v. Los Angeles County Employees' Assn., supra,* 38 Cal.3d 564 at p. 591, fn. 39 ["the policy questions involved are highly debatable, and best left to the legislative branch"]; *Northgate Partnership v. City of Sacramento, supra,* 155 Cal.App.3d 65 at pp. 71-73.) This court and others have recognized that prudence can require action where the anticipated harm cannot be calibrated with the accuracy of a jeweler's scale. (See e.g., *In re Eric B.* (1987) 189 Cal.App.3d 996, 1002-1004 [235 Cal.Rptr. 22] [wardship justified by possible recurrence of deadly disease]; *Dennis v. United States* (1951) 341 U.S. 494, 509-510 [95 L.Ed. 1137, 1152-1153, 71 S.Ct. 857] [realization of feared harm is not the criterion of governmental power to act].)

We have emphasized the peril to public health as the most obvious factor justifying the County's determination that there was "a substantial likelihood that serious harm [would] be experienced" (*Dow Chemical Co. v. Blum, supra,* 469 F.Supp. 892 at p. 902) if it took no action. But the fact that SCOPE's "sickouts" had adverse consequences in other areas can only have added to the County's concern. Viewing these manifold consequences, the County was amply justified in concluding that it confronted an "emergency of grave character and serious moment" demanding immediate action. (See *San Christina etc. Co. v. San Francisco, supra,* 167 Cal. 762 at p. 773.) In the absence of contrary evidence from SCOPE, that conclusion ought to have been respected by the trial court.

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed.

Anderson, P. J., and Reardon, J., concurred.

---

*See footnote, *ante*, page 267.