**In re COUNTY OF ORANGE, a political subdivision of the State of California; Orange County Investment Pools, an instrumentality of the County of Orange, Debtors.**

**ORANGE COUNTY EMPLOYEES ASSOCIATION, (OCEA), Association of Orange County Deputy Sheriffs (AOCDS), American Federation of State, County and Municipal Employees AFL–CIO, Council 36, Local 2076, Los Angeles and Orange County Firefighters Local 1014, I.A.F.F.–AFL–CIO, Service Employees International Union, AFL–CIO Local 787, Orange County Attorneys Association, Association of Deputy Marshals of Orange County (ADMOC), International Union of Operating Engineers, Local 501 AFL–CIO, and Orange County Fire Department Chief Officers Association, Plaintiffs,**

v.

**COUNTY OF ORANGE, Defendant.**

**Bankruptcy No. SA 94–22272 JR.**

**Adv. No. SA 95–1072 JR.**

**SA 94–22273 JR.**

United States Bankruptcy Court, C.D. California.

March 3, 1995.

---

James I. Stang, Larry W. Gabriel, Marc Beilinson and Christopher D. Cameron of Pachulski, Stang, Ziehl & Young, Los Angeles, CA, for movant.

Charles D. Axelrod, Michael H. Goldstein and Lee R. Bogdanoff of Stutman, Treister & Glatt, Los Angeles, CA, special reorganization counsel for debtors.

Deborah Gmeiner, Deputy County Counsel, Santa Ana, CA, deputy county counsel for defendant.

Robert Jay Moore, Murphy, Weir & Butler, Los Angeles, CA, for Official Committee of Creditors of County of Orange.

G. Larry Engel, Brobeck, Phleger & Harrison, San Francisco, CA, for Official Committee of Pool Participants.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

On December 22, 1994, the County of Orange (the "County") adopted a series of cost reduction resolutions (the "Resolutions") to address a severe shortfall in its general fund. As part of the efforts to bring its expenses in line with expected revenues, the County unilaterally suspended certain provisions of its employee agreements that it had with various County employee bargaining units. On January 17, 1995, ten County employee organizations joined forces (the "Coalition") and initiated a lawsuit in the Orange County Superior Court. The lawsuit was removed to this court. The Coalition also filed an *ex parte* application for a temporary restraining order ("TRO") against the County to restrain it from implementing certain layoffs in accordance with the Resolutions.

At a hearing on January 20, 1995, I issued a TRO and ordered the parties to meet and confer regarding the layoffs and adoption of appropriate procedures for future layoffs given the fiscal emergency gripping the County. This memorandum opinion sets forth my reasons for issuing the TRO.

1. These conditions were developed in accordance with the Meyers–Milias–Brown Act (the "MMBA"), Cal.Gov't Code § 3500 *et seq.* (West 1980). The purpose of the MMBA is to "promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations." Cal.Gov't Code § 3500.

2. Under California state law, the County treasurer "shall receive and keep safely all money belonging to the County...." Cal.Gov't Code § 27000 (West 1988). Monies from various entities were invested in the Pool. The Pool has 187

## JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## STATEMENT OF FACTS

The Coalition collectively represents many of the County employees in connection with the terms and conditions of their employment. The County and its employees entered into various Memorandum of Understandings ("MOU's") that encompass their agreements regarding wages, hours and other terms and conditions of employment.[1] The County's Board of Supervisors (the "Board") adopted the MOU's, and they became binding agreements governing the relationship between the County and its employees. The MOU's expire on June 20, 1996.

On December 6, 1994, the County and its Investment Pools (the "Pool") shocked the nation by filing Chapter 9 petitions in bankruptcy. The filings were caused by substantial losses in the Pool.[2] The financial crisis is acute and immediate. The County's pro rata loss in the Pool is estimated at $527 million. Additionally, the County has a projected budget shortfall for the remainder of the fiscal

investors including many school, water, sanitation and transportation districts, pension funds, etc. The total amount invested in the Pool was approximately $7.5 billion. The Pool losses are currently estimated at approximately $1.7 billion. The County leveraged the Pool portfolio to increase the income return for the Pool participants. As interest rates increased, the value of the collateral pledged to secure the Pool loans decreased. In early December, some of the lenders to the Pool made demand for additional collateral. Faced with the prospect of the liquidation of the Pool portfolio, Debtors filed their Chapter 9 petitions.

year ending June 1995 of $172 million. Without some dramatic changes, a much greater deficit for fiscal year 1995–96 is projected.

The Resolutions were a response to this immediate fiscal crisis. The Board appointed a three-person management council (the "Council") to make recommendations to the Board on how to deal with the budget shortfall.[3] As part of its cost reduction recommendations, the Council recommended that many of the employee rights in the MOU's be eliminated.[4] Among other things, the Resolutions effectively eliminated employee seniority and grievance rights. As instructed and authorized by the Council, agency and department heads were given complete freedom to terminate employees in order to meet certain specified reductions.

In response, the Coalition, on behalf of its members and certain other employee groups, filed a lawsuit in the California Superior Court seeking a writ of mandate to force the County to adhere to its contractual commitments under the MOU's. It also sought an immediate TRO against certain layoffs that had been initiated by the County on December 22, 1994.[5] Just prior to the TRO hearing, on January 17, 1995, the County removed the matter to this court. The Coalition asked for an emergency hearing to remand the proceeding back to state court. I refused to hear a remand motion on an emergency basis. However, I agreed to hear the TRO request if the Coalition wished to proceed on that basis. Late in the afternoon of January 17, 1995, I held a short hearing and learned that the 14–day layoff notices had

already been sent to the 186 employees. Because the MOU's allow the County to temporarily layoff employees without having to comply with seniority and grievance procedures, I decided to put the matter over for an evidentiary hearing.

On January 20, 1995, I conducted an all-day evidentiary hearing. At the end of the hearing, I imposed a TRO against the permanent layoff of any employee until further order of the court. So as to not impair the County's efforts to reorganize and reduce its expenses, the employees who had received permanent layoff notices were to be treated as temporarily laid off. I also ordered the parties to meet and confer in an attempt to work out their differences, guided by the principles that the employees needed to be treated fairly and the County had to have flexibility to address its fiscal crisis.

## DISCUSSION

The question before me is whether the County had the right to make unilateral changes to the MOU's. The hearing and the evidence centered on the necessity for the unilateral changes. The primary witnesses for the County were Personnel Director Judy Davis and Sheriff Brad Gates. Davis testified that the agency and department heads informed her that to meet the targeted reductions, elimination of seniority and grievance procedures under the MOU's was critical. The County's main concerns were the time it took to finalize reductions given the "bumping rights" of senior employees and the disruption that bumping causes.[6] Sheriff Gates testified that the bumping process would take at least 60 days and if this oc-

---

3. The Council consisted of Sheriff Brad Gates, District Attorney Michael Capizzi and Health Services Administrator Tom Uram. The Council had the authority to direct the daily operations of all County services.

4. Specifically, the County set aside the layoff procedures in the MOU's and replaced them with new procedures eliminating grievance procedures and granting agency heads wide discretion to layoff employees. In addition, the Resolutions eliminated salary adjustment and merit increase provisions. Moreover, if an employee retired after January 10, 1995, any accrued vacation, sick or compensation time would only be paid through the bankruptcy process.

5. The County planned to layoff 186 employees in its first round of cuts.

6. Under the MOU's bumping procedures, any regular employee who is subject to layoff may request a reduction to a lower class within the same occupational series, provided that the employee possesses the minimum qualifications for the class and passes any required performance tests. The reduction will be granted if there is a vacant position in the layoff unit or if the employee in the lower class has fewer layoff points (based primarily on years of service) than the employee requesting the reduction (i.e., the employee requesting the layoff may "bump" an employee in a lower class).

curred, it would make it impossible for the County to accomplish the $41 million in cuts necessary for fiscal year 1994–95. He also affirmed that the County did not discuss alternatives with the Coalition before the County unilaterally acted.

The principal witness for the Coalition was Nicholas Bernardino, Director of Employee Relations for the Orange County Employees Association. He stated that the Coalition recognizes that its members will have to bear a heavy burden in order for the County to get its fiscal affairs in order. He stressed that the Coalition had not been adverse to sitting down with the County and discussing necessary changes. According to Bernardino, the Coalition was and is willing to shorten the time periods for bumping so that layoffs can be finalized quickly. The County, however, was not receptive to discussing the issues.

■ The Ninth Circuit test for the issuance of injunctive relief is (1) a probable success on the merits and the possibility of irreparable harm; or (2) the existence of serious questions going to the merits and a balance of hardships tipping sharply in favor of the moving party. *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1389 (9th Cir.1988).

Regarding the County's probable success on the merits, the County contends that the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1983), is dispositive. It argues that because Congress did not incorporate § 1113 of the Bankruptcy Code (the "Code")[7] into Chapter 9 through Code § 901,[8] *Bildisco* controls and allows it the flexibility to make unilateral changes to the MOU's.[9]

The Coalition responds that *Bildisco* does not control in the Chapter 9 context. Rather, the court should apply state law especially in light of Code §§ 903[10] and 904.[11] Accord-

---

7. The Code is set forth in 11 U.S.C. §§ 101–1330 (1994). Section 1113 reflects Congressional displeasure with *Bildisco*'s holding that prior to rejection, a Chapter 11 debtor-in-possession can unilaterally modify a collective bargaining agreement. Thus, pursuant to § 1113, a Chapter 11 debtor-in-possession must adhere to the terms of its collective bargaining agreement pending rejection.

8. Section 901(a) makes applicable to Chapter 9 all or portions of forty-six different sections of Chapters 3, 5, and 11 of the Code. These sections of the Code were carefully selected as being necessary or desirable to the conduct of a Chapter 9 case. 4 *Collier on Bankruptcy,* ¶ 901.03 at 901–6 (L. King 15th ed. 1994).

9. Although there is no clear explanation as to why Congress excluded § 1113 from Chapter 9, many believe that Congress was concerned about encroaching on state rights under the Tenth Amendment and therefore left to the states, when authorizing municipalities to use Chapter 9, the determination of the extent to which collective bargaining agreements can be modified. *See infra* note 15 and accompanying text discussing the Municipal Employee Protection Amendment, H.R. 3949, 102d Cong., 1st Sess. (1991); *See also Hearing Before the Subcomm. on Economic and Commercial Law of the House Comm. on the Judiciary,* 102d Cong., 2d Sess. 69–76 (1992).

10. Section 903 states: "This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality...." In essence, § 903 states that Chapter 9 does not affect the power of a state to control its municipality. The purpose of this provision is to remove any inference that Chapter 9 does anything more than provide a method for municipalities to adjust their indebtedness. 4 *Collier, supra,* ¶ 903.02 at 903–3. The legislative history of Chapter 9 indicates that § 903 was crucial to the constitutionality of Chapter 9. In fact, the Supreme Court relied, in part, on the limitations imposed by § 903, when it upheld the constitutionality of the 1937 Municipal Bankruptcy Act (the "1937 Act") in *United States v. Bekins,* 304 U.S. 27, 51, 58 S.Ct. 811, 815, 82 L.Ed. 1137 (1938). 4 *Collier, supra,* ¶ 903.02 at 903–2.

11. Section 904 states:
Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
(1) any of the political or governmental powers of the debtor;
(2) any of the property or revenues of the debtor; or
(3) the debtor's use or enjoyment of any income-producing property.
The purpose of this provision was to circumvent any possible Tenth Amendment objection to municipal bankruptcy legislation. 4 *Collier, supra,* ¶ 904.01 at 904–01. The limitations imposed by § 904 were important to the *Bekins* Court, and it is unlikely that any municipal bankruptcy legislation would have been passed without them. *Id.* at 904–2.

182

ing to the Coalition, § 903 specifically recognizes the rights of a state to control its municipalities. The Coalition argues that because California, through the MMBA, has provided the mechanism by which the County and its employees are to negotiate and resolve their differences, state law should control unless Congress has clearly indicated a contrary intent. The Coalition further argues that the County's unilateral modifications constituted unconstitutional impairments of its contractual rights.[12]

In *Bildisco*, the Supreme Court resolved two important issues regarding collective bargaining agreements in bankruptcy. During its Chapter 11 case and prior to rejection, Bildisco refused to comply with certain provisions of its collective bargaining agreement. *Bildisco*, 465 U.S. at 518, 104 S.Ct. at 1192. The union filed unfair labor practice charges with the National Labor Relations Board (the "NLRB"). *Id.* The NLRB found that Bildisco had violated various provisions of the National Labor Relations Act by unilaterally changing the terms of the collective-bargaining agreement and by refusing to negotiate with the union. *Id.* at 519, 104 S.Ct. at 1192.

The Court was asked to decide (1) whether the standard to reject a collective bargaining agreement should be stricter than the business judgment standard normally applied in rejecting contracts under Code § 365;[13] and (2) whether the NLRB can find a debtor-in-possession guilty of an unfair labor practice for unilaterally rejecting or modifying a collective bargaining agreement before formal rejection is authorized by the bankruptcy court. *Id.* at 516, 104 S.Ct. at 1191.

As to the first issue, the Court held that a stricter standard was appropriate and stated that "the Bankruptcy Court should permit

rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Id.* at 526, 104 S.Ct. at 1196. The Court also stated that the Bankruptcy Court should ensure that reasonable efforts have been made by the debtor to negotiate voluntary modifications and that such efforts are not likely to produce satisfactory results. *Id.* In this regard, the Court urged bankruptcy judges not to step into the process unless the parties are unable to reach agreement and the reorganization is threatened. *Id.* Furthermore, the Bankruptcy Court should weigh both the degree and quality of hardships faced by the parties in coming to its decision. *Id.* at 527, 104 S.Ct. at 1196.

Regarding the second issue, by a five to four decision, the Court held that a collective-bargaining agreement in bankruptcy is "no longer immediately enforceable, and may never be enforceable again." *Id.* at 532, 104 S.Ct. at 1199. To hold otherwise, the Court felt would limit the flexibility and breathing space that a debtor needs and is provided under the Code. *Id.* Accordingly, the NLRB could not enforce the collective-bargaining agreement because the agreement was unenforceable in bankruptcy. *Id.* The Court did, however, affirm the obligation of a debtor-in-possession to bargain in good faith over the terms and conditions of a new contract. *Id.* at 534, 104 S.Ct. at 1200.

Labor unions were very upset at the Supreme Court's decision in *Bildisco* that collective-bargaining agreements were not enforceable in bankruptcy prior to rejection. In response, Congress passed § 1113.[14] It

12. The County believes that the fiscal emergency justified its unilateral actions. The four prong test for determining whether emergency legislation impairing contracts is constitutionally permissible is set forth in *Sonoma County Organization of Public Employees v. County of Sonoma*, 23 Cal.3d 296, 152 Cal.Rptr. 903, 907, 591 P.2d 1, 5 (1979) ("*Sonoma I*"). The Coalition argues that the Resolutions are unconstitutional because they are not limited to that which is reasonably necessary to deal with the emergency.

13. Section 365(a) provides: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

14. Section 1113(f) provides: "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." Sec-

did not, however, change Chapter 9 to make § 1113 applicable. There is no indication in the Congressional record of any discussion about the applicability of § 1113 in Chapter 9. Later, Congress amended Chapter 9 and still did not incorporate § 1113 into Chapter 9.[15]

■ Given this history, I conclude that *Bildisco* applies in Chapter 9 since Congress has had numerous opportunities to limit its effect by incorporating § 1113 into Chapter 9. Does this, however, mean that a municipality in bankruptcy can unilaterally breach collective bargaining agreements with its unions without limitations? I do not believe so given certain fundamental differences between Chapter 9 and Chapter 11.

The history of Chapter 9 reflects concern on the part of Congress not to overstep the boundary between legislation necessary for municipalities to reorganize and the rights of states to control the functions of their municipalities. This boundary has not always been easy to define.[16] Section 903 is a specific directive to bankruptcy courts to proceed cautiously when approaching this line. The MMBA states a clear preference that municipalities meet and confer with representatives of their employees to negotiate the terms and conditions of their employment. Once these contract rights are incorporated into the MOU's and approved by the municipal authority, the MOU's become binding and enforceable.[17] California law, however, does recognize that emergencies occasionally occur that require exceptions to the general rule that a municipality meet and confer with the employee representatives before acting inconsistent with the MOU's.[18] The County asserts that if *Bildisco* does not apply, its fiscal emergency justifies its unilateral actions under state law and its action should only be reviewed for abuse of discretion.[19]

tion 1113 was added pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub.L. 98–353, Title III, § 541(a), 98 Stat. 333, 390 (1984). Section 1113 represents a compromise between H.R. 5174, as originally adopted by the House of Representatives and various Senate proposals including the "Packwood Amendment" (It stated that the debtor's proposal should contain "the minimum modifications in such employees' benefits and protections that are necessary to permit the reorganization of the debtor.") and the "Thurmond Amendment" (It stated that rejection be permitted if "the inability to reach an agreement threatens to impede the success of the debtor's reorganization."). 5 *Collier, supra,* ¶ 1113.01 at 1113–4.

**15.** The legislative history of the Bankruptcy Reform Act of 1994 ("1994 Act"), Pub.L. No. 103–394, 103d Cong., 2d Sess., 108 Stat. 4106, indicates that Congress contemplated enacting a "§ 1113–like" statute for Chapter 9. The 1994 Act had its origin in a 1991 House Bill called the "Municipal Employee Protection Amendments of 1991." H.R. 3949, 102d Cong., 1st Sess. (1991). H.R. 3949 attempted to add § 943(b)(7) to the Code. The proposed section provided: "The debtor which seeks approval of changes to a labor agreement [must first exhaust all] state law procedures for the bargaining, implementation, and amendment of a collective bargaining agreement." This section would have forced a Chapter 9 debtor to comply with its collective bargaining agreement; however, it was never enacted into law.

**16.** The first Municipal Bankruptcy Act was enacted in 1934 (the "1934 Act"). In developing this legislation, Congress was aware of the potential conflict between bankruptcy law and the Tenth Amendment. 4 *Collier, supra,* ¶ 900.01 at 900–4. Therefore, Congress made painstaking efforts to harmonize its legislation with state sovereignty. *Id.* Notwithstanding these efforts, in *Ashton v. Cameron County Water District No. 1,* 298 U.S. 513, 531–32, 56 S.Ct. 892, 896–97, 80 L.Ed. 1309 (1936), the Supreme Court held that Chapter 9 unconstitutionally encroached upon state sovereignty. One year later, Congress enacted the 1937 Act. The 1937 Act contained nearly identical protections for state sovereignty as the 1934 act. 4 *Collier, supra,* ¶ 900.01 at 900–5. That notwithstanding, the Supreme Court upheld the revised act in *Bekins,* 304 U.S. at 51, 58 S.Ct. at 815.

**17.** *Voters For Responsible Retirement v. Board of Supervisors,* 8 Cal.4th 765, 35 Cal.Rptr.2d 814, 823, 884 P.2d 645, 654 (1994) (one of the main purposes of the MMBA is to resolve disputes between employers and employees through binding agreements).

**18.** California Government Code § 3504.5 (West 1980). *See also Public/Private Employees, Local 707 v. County of Sonoma,* 1 Cal.App.4th 267, 1 Cal.Rptr.2d 850 (1991) ("Sonoma II").

**19.** The County's argument was based on the holding in *Sonoma II.* In that case, the County of Sonoma ("Sonoma") was negotiating a new labor contract with its workforce. *Sonoma II,* 1 Cal.Rptr.2d at 851. Dissatisfied with the progress of the negotiations, the employees orchestrated "rolling sickouts." *Id.,* 1 Cal.Rptr.2d at 852. In response, Sonoma unilaterally adopted

■ The Coalition contends that the fiscal emergency did not necessitate acting without meeting and conferring with the Coalition to work out less onerous modifications to the MOU's. The Coalition further argues that before impairing its contractual rights on the basis of an emergency, the County must satisfy the following four-part test as set forth in *Sonoma I:* [20] (1) a declared emergency must be based on an adequate factual foundation; (2) the agency's action must be designed to protect a basic social interest and not benefit a particular individual; (3) the law must be appropriate for the emergency and obligation; and (4) the agency decision must be temporary, limited to the immediate exigency that caused the action. *Sonoma I,* 591 P.2d at 5, *citing Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). In my view, any unilateral action by a municipality to impair a contract with its employees must satisfy these factors if not as a legal matter, certainly from an equitable standpoint. In applying these factors, the County declared its fiscal emergency and the evidence adequately supports the declaration. The action is designed for the social good of the County and not for the benefit of an individual. However, in my view, the emergency did not necessitate the complete abrogation of seniority and grievance procedures without first attempting to negotiate acceptable changes. Also, the action did not indicate that it was for a temporary time, but given the County's fiscal situation, the exigency is likely to continue until the bankruptcy is resolved.

■ In Chapter 9, *Bildisco* does not excuse attempts by the County to comply with the requirements of California law. Unilateral action may be justified if an emergency exists. However, if an emergency is declared, the factors set forth in *Sonoma I* must be satisfied. In this case, the abrogation of seniority and grievance procedures was not appropriate under the circumstances. The County should have recognized its obligation under California law to communicate, meet, confer and negotiate with its employees regarding changes to the terms and conditions of their employment. Chapter 9 recognizes the interests of the state and a proper balance between state and federal interests. This balance requires that when modifying contractual rights under municipal collective-bargaining agreements, municipalities must view unilateral action as a last resort.

Based on the above analysis, I find that the Coalition will probably succeed on the merits. In addressing the other factors for the award of injunctive relief, the Coalition also prevails. Certainly, employees who are

---

Ordinance No. 89–4040 (the "Ordinance"), giving department heads the authority to place those engaged in the "sickouts" on administrative unpaid absence. *Id.* The employees filed a petition for writ of mandate, alleging that the Ordinance was invalid because Sonoma failed to meet and confer prior to the Ordinance's adoption as required by the MMBA. *Id.,* 1 Cal.Rptr.2d at 853. The trial court held that because no bona fide emergency existed at the time the Ordinance was adopted, Sonoma breached its duty to meet and confer prior to enacting the Ordinance and, therefore, the Ordinance was invalid. *Id.* The County appealed. *Id.*

The question before the appellate court was whether Sonoma was faced with a bona fide "emergency." The court agreed with Sonoma. *Id.,* 1 Cal.Rptr.2d at 854. The court held that "[i]n the absence of evidence to the contrary it will be assumed that a municipal legislative body acted on sufficient inquiry as to whether an emergency existed." *Id.,* 1 Cal.Rptr.2d at 855. Moreover, a declaration of an emergency by a municipality is prima facie evidence of that fact. *Id.* Based on the foregoing, the County contends that its declaration of an emergency is prima facie evidence of that fact, and, therefore, the Resolution is valid.

In this case, I agree that there was a fiscal emergency which required quick action. The County's declaration of an emergency was reasonable given the County's $172 million cash flow shortfall. However, *Sonoma II* only excuses a municipality from its notice and meet and confer obligations *prior* to enacting new legislation. It does not validate the legislation itself.

**20.** In *Sonoma I,* the California Legislature, in response to Proposition 13, passed a statute prohibiting the distribution of state surplus or loan funds to any local public agency that granted its employees a cost-of-living increase which exceeded that granted to state employees. *Sonoma I,* 591 P.2d at 3. In addition, the statute declared null and void any agreement by a local agency to pay a cost of living increase in excess of that granted to state employees. *Id.* Several labor organizations sought writs of mandate alleging that the statute was an unconstitutional impairment of contracts. *Id.* In response, the county argued that its fiscal emergency justified the impairment. *Id.*

permanently laid off without promised seniority or grievance rights have the potential for suffering irreparable injury. Additionally, serious questions are involved which require a thoughtful review. As far as I know, no other court has addressed the implications of *Bildisco* in Chapter 9. Lastly, the hardships tip sharply in favor of the Coalition. The County did not establish to my satisfaction that it could not achieve its fiscal and reorganizational goals absent unilateral action. Chief Gates testified that the health, safety and welfare of the County would suffer unless the County could layoff employees in the manner stated in the Resolutions. His view was framed by the time it normally took to finalize layoffs and the potential disruption to operations created by bumping. The Coalition, however, indicated that it was willing to shorten the normal time periods to make the process work in accordance with the County's fiscal needs. The hardship to laid off employees needs no elaboration. For those who have suffered this injury, especially when it is unexpected and not the employee's fault, no easy way exists to handle the suffering. The families of these employees also bear the pain. The balance of hardships tips sharply in favor of the Coalition.

### CONCLUSION

In summary, since all the factors for granting injunctive relief favor the Coalition, this court enjoins the County from treating any of the employees as permanently laid off. Rather, they shall be treated as temporarily laid off for four weeks, as provided in the MOU's. The parties are ordered to meet and confer and attempt to resolve their differences. The Coalition must take into consideration the fiscal and reorganization needs of the County, and the County must recognize that seniority and grievance rights need to be preserved to the extent possible. Lastly, due process protection for employees is of paramount importance.

I do not believe this result conflicts in principle with *Bildisco*. The Supreme Court

---

**21.** As a result of multiple meet and confer sessions and a settlement conference, most of the differences between the parties were resolved. At a hearing on February 9, 1995, the court approved a preliminary injunction that incorpo-

emphasized the importance of the meet and confer process to work out differences. *Bildisco*, 465 U.S. at 526, 104 S.Ct. at 1196. The court will set a status hearing to review the parties' progress as a result of their meet and confer meetings.[21]

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.

rated streamlined procedures for the exercise of seniority and grievance rights. These procedures will apply not only to the current layoff group, but future layoffs as well.